[No. S088025. Aug. 27, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JULIO CESAR SANCHEZ, Defendant and Appellant.

## COUNSEL

Melvyn Douglas Sacks; Solomon, Saltsman & Jamieson, Ralph Barat Saltsman and Stephen Warren Solomon for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley, Garrett Beaumont and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—Defendant Julio Cesar Sanchez and his codefendant, Ramon Gonzalez, were each charged with first degree murder in connection with the shooting death of Reynaldo Estrada. Defendant, a gang member, was the passenger in a car that drove by a house outside of which Gonzalez, a rival gang member, and a friend were standing. Both defendants had armed themselves for the confrontation. As defendant's car made its third pass by the house in the course of several minutes, shots were exchanged and Mr. Estrada, an innocent bystander, was hit and killed by a single stray bullet.

The evidence adduced at trial did not establish whether defendant or Gonzalez fired the shot that killed Estrada because the real evidence probative on the point (specifically the guns and bullet casings used in the shooting) was not recovered. Similarly, evidence regarding the trajectory of the fatal bullet was inconclusive in that it supported a finding that either defendant or Gonzalez could have fired the fatal shot.

The district attorney prosecuted defendant for first degree murder on two theories: premeditated first degree murder (Pen. Code, § 189)[1] and first degree murder perpetrated by means of intentionally discharging a firearm from a motor vehicle with specific intent to inflict death. (*Ibid.*) As to Gonzalez, the only theory of first degree murder advanced was premeditation. If all the elements of first degree murder were otherwise established,

---

[1] All further statutory references are to this code unless otherwise specified.

both defendants could be held liable for the unintended death of innocent bystander Estrada by operation of the doctrine of transferred intent.

The jury convicted defendant and Gonzalez of first degree murder. The Court of Appeal reversed defendant's[2] conviction, concluding "there are no theories under which the jury could have found both defendant and Gonzalez guilty of first degree murder." The court believed the undisputed circumstance that only one bullet hit and killed Estrada eliminated concurrent causation as a theory of liability for the murder. The court went on to conclude that the jury's verdict finding Gonzalez guilty of first degree murder necessarily reflected he was found to be the actual shooter of the single fatal bullet, that consequently defendant must have been found guilty under the provocative act murder theory[3] on which the jury was also instructed, and that defendant's murder conviction, so based, was invalid because Gonzalez's premeditation as the actual shooter precluded or cut off defendant's provocative act murder liability.

We granted the People's petition for review to determine whether defendant was properly convicted of first degree murder on these facts. As will be explained, the Court of Appeal erred in concluding concurrent causation cannot be established in a single-fatal-bullet case. The circumstance that it cannot be determined who fired the single fatal bullet does not undermine defendant's conviction under either of the two first degree murder theories advanced against him at trial—premeditation (§ 189), and murder by means of intentionally discharging a firearm from a motor vehicle with specific intent to inflict death. (*Ibid.*) Defendant's act of engaging Gonzalez in a gun battle and attempting to murder him was a substantial concurrent, and hence proximate, cause of Estrada's death through operation of the doctrine of transferred intent. Sufficient evidence supports defendant's first degree murder conviction under either theory, and contrary to the conclusion of the Court of Appeal, the record does not affirmatively suggest the jury relied on any improper or unsubstantiated theory in convicting defendant of the charge.[4] Accordingly, the judgment of the Court of Appeal shall be reversed.

[2]Gonzalez is not a direct party to this appeal.

[3]Provocative act murder traditionally has been viewed as a form of implied malice murder, originally derived as an offshoot of the felony-murder rule. (See *People v. Washington* (1965) 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130] ["Defendants who initiate gun battles may also be found guilty of murder if their victims resist and kill. Under such circumstances, 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death' [citation], and it is unnecessary to imply malice by invoking the felony-murder doctrine."].)

[4]Indeed, as will further be explained, examination of the jury's verdicts in light of the instructions given reflects that defendant's murder conviction was not based on the provocative act murder theory.

*Facts and Procedural History*

Defendant is a member of a Fontana gang named TDK (Diablo Klicka).[5] Gonzalez is a member of a rival Fontana gang, the Headhunters. On the date in question Gonzalez lived on Poplar Avenue; the Headhunter graffiti on the curb in front of his house plainly marked the location as Headhunter gang territory. Sometime during the afternoon of September 3, 1996, defendant and Gonzalez, each in the company of a fellow gang member, engaged one another in a gang-related gun battle in front of Gonzalez's house, during which Estrada, an innocent neighbor who was working on his car with his sons a few doors down, was shot in the head and killed by a single stray bullet.

Christopher Draper, a friend of Gonzalez's who was himself associated with another gang named TMK, testified that on the afternoon in question three Hispanic males whom he recognized from their clothes and shaved heads as rival gang members drove by his (Draper's) home, stopped, and got out of their vehicle. Draper became scared; when the group left he took a .22-caliber semiautomatic pistol he had stolen from his mother and got a ride to Gonzalez's home on Poplar Avenue.

Later that afternoon, as Gonzalez and Draper were standing in front of Gonzalez's home, a black Ford Escort drove slowly by. Defendant, who owned the vehicle but was not driving because he had a suspended driver's license, was the passenger. Fellow TDK gang member Omar Mendez was the driver. Draper recognized the black Escort as one that had been involved in an incident several months earlier in which Draper had been shot at by the vehicle's occupants, one of whom had yelled out "TDK."[6] As the Escort drove past Gonzalez's home, Draper believed its occupants were TDK members.

The Escort left and returned to Gonzalez's street 15 or 20 minutes later. According to Draper, as it drove by the second time the occupants "mad-dogged" or stared down Draper and Gonzalez. Feeling threatened, Draper took the gun he had brought with him, placed it next to a bush on Gonzalez's front lawn, covered it with a T-shirt, and showed Gonzalez where he had put it.

The Escort drove off and returned yet a third time, approaching from the south. According to Draper, the Escort stopped about two houses away from

[5]Defendant has a TDK tattoo on his back. A Fontana police officer assigned to the gang unit testified that there was much hatred between TDK and the Headhunters. Six months earlier, defendant had told another officer that a Headhunter had shot at him because he was a member of TDK.

[6]Draper's credibility was seriously questioned at trial; his testimony contradicted his prior statements to detectives as well as his preliminary hearing testimony on a number of points.

Gonzalez's house, and the passenger (defendant), who was sitting on the window frame of the passenger door, fired one shot over the roof of the Escort towards Draper and Gonzalez. Gonzalez retrieved the gun Draper had placed next to the bush and fired back at defendant and Mendez about four times. Defendant fired three or four more rounds over the roof of the Escort as it sped off. Draper recognized the passenger as defendant, whom he knew from middle school, although he did not tell that to police when they arrived. Indeed, at first Gonzalez and Draper told the police they had been fired at by the occupants of the Escort, and said nothing of Gonzalez's having returned the fire.

At the time of the gun battle, Reynaldo Estrada, his wife, and their son Miguel were visiting their married son Rene who lived on Poplar Avenue close to Gonzalez's house. The men were working on the father's truck in the driveway when the shooting erupted. Rene had noticed a dark-colored car driving slowly by his home, and saw Christopher Draper in front of Gonzalez's house making a pointing motion, possibly in the direction of the car. Two sets of shots rang out, the second series louder than the first, and Mr. Estrada fell to the ground. The sons called 911; Mr. Estrada died in the hospital from a single gunshot wound to the head after remaining on life support for several days.

Gonzalez's sister Yolanda was at the Gonzalez house on the date in question. She testified that the first time the Ford Escort drove by she saw the vehicle's occupants flash gang hand signs at them. When the car drove slowly by the Gonzalez house the second time, she heard Gonzalez and Draper yell to the occupants, "Come back."

Omar Mendez, also a member of the TDK gang, testified he drove defendant's black Ford Escort during the drive-by shooting. When first driving down Poplar Avenue, he and defendant noticed Draper and Gonzalez standing in front of Gonzalez's house. Believing they had possibly thrown gang hand signs at them, Mendez and defendant made a U-turn to investigate. According to Mendez, Gonzalez started shooting at them and defendant returned the fire. Mendez claimed to have been unaware defendant was armed with a gun, although his preliminary hearing testimony was to the contrary. Afterwards, Mendez drove to Cesar Padilla's house on Athol Street, where other TDK members were known to congregate. Juan Ramirez, a TDK member present at the house, heard Mendez state that he and defendant had just been involved in a shooting with the Headhunters. Another TDK member, Anthony Castellanos, heard Mendez state they had been involved in a "shoot-out" with "some fools." Police arrived at the Padilla residence in short order and recovered a nine-millimeter semiautomatic Ruger pistol from

Ramirez's person. The Ruger was a "gang gun" that belonged to the members of TDK as a group. Expert ballistics testimony established that the shot that killed Estrada had not been fired from the Ruger.

The fatal bullet recovered from Estrada's body was found to be consistent in size with .38-caliber and .357-caliber ammunition. No bullets or shell casings were recovered from the murder scene. Police arriving on the scene observed Draper and others picking up things from the street in front of Gonzalez's house; the prosecution theorized that bullets and/or shell casings were being retrieved to eliminate evidence that Gonzalez had shot at the Ford Escort. Draper conceded as much in his interviews with detectives, but claimed he found no shell casings. The actual murder weapon was never recovered. The guns Gonzalez and Sanchez later claimed they used in the gun battle were never recovered. Nor did the testimony pertaining to the likely trajectory of the fatal bullet establish with certainty whether it had been fired by defendant from the Ford Escort, or by Gonzalez from the street in front of his house.

Gonzalez was interviewed by police after the incident. He admitted he was a member of the Headhunters. He admitted that TDK and the Headhunters were in continual conflict and that members of the two gangs had shot at each other in the past. He claimed that when the black Ford Escort stopped in front of his house he (Gonzalez) fired off the first shots. Although he did not see a weapon inside the vehicle, he saw one of the occupants making a reaching motion with his hand. He (Gonzalez) was using the gun Christopher Draper had given him that was hidden near some bushes in the front yard.

Defendant was interviewed on three separate occasions after being taken into custody. In the first interview, he denied that he or his black Ford Escort had been involved in the incident, although he admitted membership in the TDK. In the second interview, he admitted being involved in the shooting but denied that he had personally fired a weapon. In the third interview, he stated he and Mendez had gone back to the Gonzalez residence in his black Ford Escort because persons there had "flipped [him] off" and flashed gang hand signs. When they drove by, two people began shooting at his car from the middle of the street. The shooter who fired most of the shots was wearing a blue checkered shirt.[7] Defendant indicated he shot back one time over the roof of his car with a .22-caliber derringer pistol, but also stated he fired off a total of two shots. After the incident he threw the derringer out of the car window.

---

[7] There was *conflicting* evidence as to whether Draper was wearing a blue checkered shirt at the time of the shooting.

In a second amended information, defendant and Gonzalez were jointly charged with murder. (§ 187.) As to defendant, it was specially alleged that the murder was committed by discharging a firearm from a motor vehicle (§ 12022.55), and that he carried a firearm during the commission of a street-gang-related crime (§ 12021.5, subd. (a)). As to Gonzalez, it was specially alleged that he discharged a firearm at an occupied motor vehicle causing death (§ 12022.5, subd. (b)(1)), and that he carried a firearm with a detachable magazine in a street-gang-related crime (§ 12021.5, subd. (b)). As to both defendants it was further alleged the murder was committed for the benefit of a street gang. (§ 186.22, subd. (b)(1).) Gonzalez was separately charged in a second count with shooting at an occupied motor vehicle in violation of section 246. As to that charge, it was alleged he discharged a firearm at the vehicle causing death (§ 12022.5, subd. (b)(1)), and that he committed the offense for the benefit of a street gang (§ 186.22, subd. (b)(1)).

In charging the jury before commencement of deliberations, the trial court gave the usual standard murder instructions. It gave this instruction on the provocative act murder doctrine: "A homicide committed during the commission of a crime by a person *who is not a perpetrator of such crime* in response to an intentional provocative act with implied malice by a defendant is considered in law to be an unlawful killing by such defendant." (Italics added; see CALJIC No. 8.12, on which the instruction was patterned.)

The court also gave the following instruction on proximate causation: "A cause of death is an act that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act, the death of a human being, and without which the death would not occur. [¶] There may be more than one cause of the death. [¶] When the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the death. [¶] A cause is a concurrent cause if it was operative at the moment of death and acted with another force to produce the death. [¶] If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person also contributed to the death." (See CALJIC Nos. 3.40, 3.41.)

Finally, the court instructed the jury on the doctrine of transferred intent as follows: "When one unlawfully attempts to kill a certain person but by mistake or inadvertence kills another person, the crime, if any, so committed is the same as though the person originally intended to be killed had in fact been killed." (See CALJIC No. 8.65.)

The jury returned verdicts finding both defendant and Gonzalez guilty of first degree murder. The allegation that defendant had carried a firearm

during the commission of a street-gang-related crime was found true; the section 12022.55 allegation was found not true. Gonzalez was separately convicted of the felony of shooting at an occupied vehicle; the section 12022.5, subdivision (b)(1) allegation was found true under that count, but not true as alleged under the murder count. Given the inconsistency, the trial court at sentencing reduced the section 12022.5, subdivision (b)(1) enhancement to personal firearm use (§ 12022.5, subd. (a)). Outside the jury's presence, defendant and Gonzalez each admitted the street-gang enhancement allegations. Both defendants were sentenced to state prison for an indeterminate term of 25 years to life for first degree murder, with Gonzalez receiving a consecutive four-year term for personal firearm use.

The Court of Appeal concluded there are no theories under which the jury could have found both defendant and Gonzalez guilty of first degree murder. The threshold premise underlying this conclusion was the court's belief that since only one bullet struck and killed Estrada, and since it could not be determined whether defendant or Gonzalez fired the fatal bullet, concurrent causation could not serve as a basis for finding both defendants liable for premeditated first degree murder. The court stated its belief that "concurrent causation . . . requires two independent acts [i.e., two distinct direct or actual causes] that converge and concurrently cause death." From there the Court of Appeal reasoned that Gonzalez's first degree murder conviction necessarily reflected he was found to be the actual shooter of the single fatal bullet, since a premeditated intentional killing was the only statutory basis on which Gonzalez's *first degree* murder conviction could have been based. The court concluded that, consequently, defendant must have been convicted under the provocative act murder theory.[8] Finally, the Court of Appeal found that to be an invalid basis for defendant's murder conviction since, in the court's view, Gonzalez's act of premeditating his (defendant's) murder in the role of the actual shooter precluded or cut off defendant's liability for murder as the provocateur.

## Discussion

■ Throughout this appeal, the parties and the Court of Appeal have focused on the application of the provocative act murder doctrine to the particular facts of this case as pivotal to the determination whether defendant was validly convicted of first degree murder. We conclude, however, that the doctrine has little significance in this appeal because it was an alternative theory of murder liability on which the jury was instructed but which, given the state of the evidence at the close of the evidentiary phase of trial, played

---

[8]As will be explained, the guilty verdicts viewed in light of the jury instructions reflect defendant was not convicted under the provocative act murder theory.

no role in defendant's conviction of first degree murder. Indeed, it was the Court of Appeal's mistaken belief that concurrent causation could not be applied in this single-fatal-bullet case that led it to the erroneous conclusion defendant and Gonzalez could not both be convicted of premeditated first degree murder. We therefore turn first to the question of concurrent proximate causation.

*Proximate causation*

We know a single stray bullet was the actual, direct cause of death. At the close of evidence all parties agreed it could not be established whether defendant or Gonzalez had fired the fatal shot. However, it is proximate causation, not direct or actual causation, which, together with the requisite culpable mens rea (malice), determines defendant's liability for murder. The Court of Appeal erred in concluding principles of concurrent causation cannot be invoked in a single-fatal-bullet case. The circumstance that it cannot be determined who fired the single fatal bullet, i.e., that direct or actual causation cannot be established, does not undermine defendant's first degree murder conviction if it was shown beyond a reasonable doubt that defendant's conduct was a substantial concurrent cause of Estrada's death.

The jury was instructed on proximate causation as follows: "A cause of death is an act that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act, the death of a human being, and without which the death would not occur. [¶] There may be more than one cause of the death. [¶] When the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the death. [¶] A cause is a concurrent cause if it was operative at the moment of death and acted with another force to produce the death. [¶] If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person also contributed to the death." (See CALJIC Nos. 3.40, 3.41.)

We have upheld a murder conviction even where the jury was uncertain whether the charged defendant actually shot the victim or served as an aider and abettor. (*People v. Garrison* (1989) 47 Cal.3d 746, 782 [254 Cal.Rptr. 257, 765 P.2d 419].) Similarly, in *People v. Pock* (1993) 19 Cal.App.4th 1263 [23 Cal.Rptr.2d 900], two defendants fired at the victim, and it could not be determined who fired the fatal bullet. The Court of Appeal observed that if Pock did not "actually fire[] the fatal shot," he "participated in all major events, not as an aider and abettor, but as an actual participant who, if he did not fire the fatal shot, certainly was responsible for instigating the firing of the fatal shot." (*Id.* at p. 1274.)

Indeed, it has long been recognized that there may be multiple proximate causes of a homicide, even where there is only one known actual or direct cause of death. In *People v. Kemp* (1957) 150 Cal.App.2d 654 [310 P.2d 680] (*Kemp*), Kemp and Coffin engaged in a car race down a public street that resulted in the death of a person in a vehicle struck by Coffin's car. Kemp "contended that there was no showing of anything attributable to him which was a proximate cause of the death, as required by section 192 of the Penal Code. [He] argued that the mere violation of section 601.5 of the Vehicle Code prohibiting speed contests on a highway is immaterial, like the failure to have a required license to drive, and could not constitute a proximate cause of the death; that the thing that caused this death is either excessive speed (violation of [Veh. Code,] § 510) or reckless driving (violation of [Veh. Code,] § 505) on the part of Coffin; that Coffin's violation of either of those sections was neither attributable nor imputable to Kemp; that Kemp neither interfered with nor had control of the actions of Coffin; and that it follows that he could not have been guilty of any unlawful act, or of any gross negligence, which was a proximate cause of this death." (*Kemp, supra,* 150 Cal.App.2d at p. 658.)

The *Kemp* court disagreed, explaining: "The evidence here strongly indicates that Kemp and Coffin were inciting and encouraging one another to drive at a fast and reckless rate of speed on a residence street and as they closely approached a blind intersection. It was by the merest chance that Kemp was able to avoid hitting the other car, and that Coffin was not. Only the matter of a split second and a few inches made the difference. They were both violating several laws, *the acts of both led directly to and were a proximate cause of the result,* and the fact that the appellant happened to narrowly escape the actual collision is not the controlling element. The evidence is sufficient to show that they were not acting independently of each other, and that they were jointly engaged in a series of acts which led directly to the collision. The language of section 192 of the Penal Code is broad enough to impose criminal liability in this situation and the evidence, with the reasonable inferences therefrom, is sufficient to show that the homicide was a proximate result of the commission of an unlawful act or acts on the part of the appellant, within the meaning of that section." (*Kemp, supra,* 150 Cal.App.2d at p. 659, italics added.)

Similarly, in a case where the evidence indisputably showed one individual's gunshot directly caused decedent's death, the trial court nonetheless instructed, through CALJIC No. 3.41, that the conduct of another individual also could have proximately caused the death. (*People v. Mai* (1994) 22 Cal.App.4th 117 [27 Cal.Rptr.2d 141] (*Mai*), disapproved on other grounds in *People v. Nguyen* (2000) 24 Cal.4th 756, 761 [102 Cal.Rptr.2d 548, 14

P.3d 221].) In upholding the trial's court's giving of the instruction, the *Mai* court explained, " 'There may be more than one proximate cause of the death. When the conduct of two or more persons *contributes concurrently as the proximate cause of the death*, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death.' " (*Mai, supra,* 22 Cal.App.4th at p. 123, fn. 5, italics added.) The *Mai* court concluded the trial court's instruction properly ensured that the jury found the defendant's conduct a proximate cause of death, notwithstanding the possibility of another such proximate cause.

Sister state decisions are in accord. For example, in *Commonwealth v. Gaynor* (1994) 538 Pa. 258 [648 A.2d 295] (*Gaynor*), the Pennsylvania Supreme Court upheld dual first degree murder convictions in a shootout case with facts similar to those now before us. Gaynor and Johnson shot at each other in the middle of a crowded store, and expert testimony established that Johnson's shots killed a child and wounded others. The Pennsylvania high court framed the issue before it as follows: "Is [appellant] Gaynor guilty of first degree murder when, with specific intent to kill, an innocent bystander was killed by the 'defendant's dueling partner?' " (*Id.* at p. 297.) Affirming the lower court's finding that sufficient evidence supported the jury's determination that the conduct of Gaynor (as well as Johnson) had proximately caused the victims' death or injuries, the court explained, "We conclude . . . that the actual result can be attributed to Gaynor's intent to kill Johnson even though the latter's bullets murdered and wounded the victims." (*Id.* at p. 299.) Several Texas cases have likewise held that defendants may be guilty of murder where they exhibit the requisite intent, even though another party inflicted the fatal wound. (*Pettigrew v. State* (1999) 999 S.W.2d 810, 812-813; *Dowden v. State* (Tex.Crim.App. 1988) 758 S.W.2d 264, 272-273; *Blansett v. State* (Tex.Crim.App. 1977) 556 S.W.2d 322, 325-327; see also *Pizano v. Superior Court* (1978) 21 Cal.3d 128, 140-141 [145 Cal.Rptr. 524, 577 P.2d 659], quoting *Taylor v. State* (1900) 41 Tex.Crim. 564 [55 S.W. 961, 964] [" 'If the appellant here set in motion the cause which occasioned the death of the deceased, . . . he would be as culpable as if he had done the deed with his own hands.' "].)

The New York high court's decision in *People v. Russell* (1998) 91 N.Y.2d 280 [670 N.Y.S.2d 166, 693 N.E.2d 193] (*Russell*) is also instructive, as it turned on facts similar to those before us in several important respects. In *Russell*, one defendant engaged in a gun battle with two others in a city housing project. During the course of the gun battle, an innocent passerby was killed by a single stray bullet. Although ballistics tests were

inconclusive in establishing which defendant was the actual shooter of the fatal bullet, the prosecution theorized that each of them had acted with sufficient mental culpability required for commission of the crime of depraved indifference murder (N.Y. Penal Law § 125.25[2]), and that each "intentionally aided" the defendant who fired the fatal shot. (*Russell, supra*, at pp. 195-196.)

The defendants in *Russell* "urge[d] . . . that the evidence adduced at trial did not support a finding that they—as adversaries in a deadly gun battle—shared the 'community of purpose' necessary for accomplice liability. [Citation.]" (*Russell, supra*, 693 N.E.2d at p. 195.) The New York high court disagreed: "The fact that defendants set out to injure or kill one another does not rationally preclude a finding that they intentionally aided each other to engage in mutual combat that caused [the innocent bystander's] death." (*Ibid.*)

The *Russell* court went on to suggest that, "*People v. Abbott* [(1981)] 84 A.D.2d 11, 445 N.Y.S.2d 344, provides an apt illustration. That case involved two defendants—Abbott and Moon—who were engaged in a 'drag race' on a residential street when Abbott lost control and smashed into another automobile, killing the driver and two passengers. Both defendants were convicted of criminally negligent homicide, but Moon asserted that he was not responsible for Abbott's actions and that his conviction should be set aside. Rejecting this argument, the court found that, although Moon did not strike the victim's car and was Abbott's adversary in a competitive race, he intentionally participated with Abbott in an inherently dangerous and unlawful activity and therefore shared Abbott's culpability. Moon's 'conduct made the race possible' in the first place, as there would not have been a race had Moon not 'accepted Abbott's challenge' (*id.* at 15, 445 N.Y.S.2d 344; *see also, People v. Fabian* [(1992)] 154 Misc.2d 957, 962, 586 N.Y.S.2d 468 [although defendants were trying to harm each other, at the same time they acted in concert to create an explosive condition that resulted inevitably in the victims' death and injuries]; *Alston v. State* [(1995)] 339 Md. 306, 320, 662 A.2d 247, 254 [there was sufficient evidence to support a jury finding that rival groups tacitly agreed, pursuant to an 'unwritten code of macho honor,' that there would be mutual combat and that each group aided, abetted and encouraged its adversary to engage in urban warfare])." (*Russell, supra*, 693 N.E.2d at p. 195.)

We agree with the above noted authorities. Although in this case it could not be determined who was the direct or actual shooter of the single fatal round, the evidence, with all reasonable inferences drawn in favor of the guilty verdicts, supports a finding that defendant's commission of life-threatening *deadly* acts in connection with his attempt on Gonzalez's life

was a substantial concurrent, and hence proximate, cause of Estrada's death. All that remained to be proved was defendant's culpable mens rea (premeditation and malice) in order to support his conviction of premeditated first degree murder. Even without a showing of premeditation, if defendant was shown to have intentionally discharged his firearm from a motor vehicle with the specific intent to inflict death, then his crime was murder in the first degree by operation of section 189.

*Mens rea*

█ The evidence supports the finding, implicit in the jury's first degree murder verdict, that defendant premeditated the murder of Gonzalez, and/or intentionally discharged a firearm from a motor vehicle with the specific intent to inflict death (§ 189). If a jury finds that a defendant proximately caused a death, either solely through his own conduct or through the actions of others where his conduct is shown to be a substantial concurrent cause of the death, and the defendant did so with a premeditated intent to kill, then the defendant is guilty of *first degree* murder. (§ 189 ["All murder which is perpetrated . . . by any . . . kind of willful, deliberate, and premeditated killing . . . is murder of the first degree."]; see also *Gaynor, supra,* 648 A.2d at pp. 298-299.)

The jury could reasonably have found on this evidence that at least as of the time the first shots rang out, defendant and Gonzalez, both members of rival gangs, had armed themselves and premeditated and deliberated the attempted murder of one another. █ "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Memro* (1995) 11 Cal.4th 786, 863 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Premeditation can be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief. (*People v. Rand* (1995) 37 Cal.App.4th 999, 1001-1002 [44 Cal.Rptr.2d 686].) "A studied hatred and enmity, including a *preplanned,* purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation." (*Id.* at p. 1001, italics added.)

█ Defendant and Gonzalez were each members of rival gangs, the TDK and the Headhunters. Members of both gangs had shot at one another in the past, and there was evidence that defendant's black Ford Escort had previously been involved in a drive-by shooting during which Gonzalez's

cohort Draper was shot at. On the afternoon in question, on a public street and at a time when people were outside in front of their homes, defendant and his fellow TDK gang member Mendez chose to drive slowly by Gonzalez's house, the street in front of the house being clearly marked with enemy "Headhunters" grafitti. There was evidence that the two groups of protagonists were "flipping off" and throwing gang hand signs at one another. Defendant came armed with a loaded handgun. At some point prior to or during the third drive past Gonzalez's house, defendant took up a shooter's position on the window frame of the open Escort passenger window as his fellow gang associate Mendez drove up the street, by one account stopping in front of Gonzalez's house, and when the shooting started, speeding off while gunfire was being exchanged.

For his part, Gonzalez may have "flipped off" and/or thrown gang hand signs at the rival gang members as they drove past his house. Gonzalez's sister testified he may have yelled toward the Ford Escort to "come back" as it passed by the house. Gonzalez too was in the company of a companion, Draper, who was known to associate with Gonzalez's gang as well as another gang, the TMK. Draper had brought a loaded handgun and placed it in a secreted position on the lawn in front of the house so as to make it quickly accessible to himself or Gonzalez.

After the gun battle, when an innocent bystander who had been standing with his family members in front of their home had been fatally shot in the head by a stray bullet, Gonzalez and Draper's response was to scour the street in an effort to recover spent bullets and shell casings that might evidence their role in the shooting, while defendant and Mendez retreated to a house where TDK gang members were known to be congregating to relate how they had just shot it out with "some fools." At trial, both defendant and Gonzalez admitted the allegations that their crimes were committed for the benefit of their street gangs.

Although the actual shooting here may have been almost spontaneous, the mutual planning of one another's murder supports a finding of premeditation as to both defendant and Gonzalez. █ ██ The requisite mental state for first degree murder (premeditation and malice) having thereby been proved, by operation of the doctrine of transferred intent,[9] both defendant

---

[9]"[U]nder the common law doctrine of transferred intent, if *A* shoots at *B* with malice aforethought but instead kills *C*, who is standing nearby, *A* is deemed liable for murder notwithstanding lack of intent to kill *C*. (See Perkins & Boyce[, Criminal Law (3d ed. 1982)] at p. 924." (*People v. Roberts* (1992) 2 Cal.4th 271, 317 [6 Cal.Rptr.2d 276, 826 P.2d 274].)

and Gonzalez became liable for first degree murder on the showing that the conduct of each was a proximate cause of Estrada's death.[10]

*Validity of defendant's murder conviction on appeal*

■ Ordinarily, if an alternative theory of criminal liability is found unsupported by the evidence, the judgment of conviction may rest on any legally sufficient theory unaffected by the error, unless the record affirmatively demonstrates that the jury relied on the unsupported ground. (See *People v. Johnson* (1993) 6 Cal.4th 1, 42 [23 Cal.Rptr.2d 593, 859 P.2d 673] (*Johnson*), citing *Griffin v. United States* (1991) 502 U.S. 46 [112 S.Ct. 466, 116 L.Ed.2d 371]; see also *People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].)

■ Contrary to the conclusion of the Court of Appeal, defendant's first degree murder conviction rested on either of two legally sufficient theories: premeditated murder (§ 189), and murder perpetrated by means of intentionally discharging a firearm from a motor vehicle with the specific intent to inflict death. (*Ibid.*) As we have explained, the evidence was sufficient to support defendant's conviction of first degree murder under either theory. Although it could not be determined who fired the fatal bullet, since sufficient evidence established that defendant and Gonzalez premeditated the

---

"The transferred intent doctrine does not . . . denote an actual 'transfer' of 'intent' from the intended victim to the unintended victim. (Cf. Prosser, *Transferred Intent* [(1967) 45 Tex.L.Rev. 650], at p. 653.) Rather, as applied here, it connotes a *policy*—that a defendant who shoots at an intended victim with intent to kill but misses and hits a bystander instead should be subject to the same criminal liability that would have been imposed had he hit his intended mark. (Hall, General Principles of Criminal Law (2d ed. 1960) p. 145.) It is the policy underlying the doctrine, rather than its literal meaning, that compels the conclusion that a transferred intent instruction was properly given in this case." (*People v. Scott* (1996) 14 Cal.4th 544, 551 [59 Cal.Rptr.2d 178, 927 P.2d 288], italics in original.)

As Justice Kennard explains in her concurring opinion, "For purposes of applying the rule of transferred intent, it does not matter whether defendant himself fired the fatal shot or instead induced or provoked another to do so; in either situation, defendant's culpable mental state is determined as if the person harmed were the person defendant meant to harm. (See *People v. Antick* (1975) 15 Cal.3d 79, 88-89 [123 Cal.Rptr. 475, 539 P.2d 43].)" (Conc. opn. of Kennard, J., *post*, at p. 856.)

[10]In defendant's case, the question of premeditation aside, if he was found to have intentionally discharged a firearm from a motor vehicle with the specific intent to inflict death, then by operation of section 189, such circumstance afforded a separate basis for the first degree murder conviction. Defendant admitted intentionally discharging his firearm from his Ford Escort in which he was the passenger. His guilty verdict reflects the jury's rejection of his claim of self-defense, and the jury could reasonably conclude on the evidence that he intentionally discharged his firearm from his vehicle with the specific intent to inflict death. Accordingly, even without a further showing of premeditation, and regardless of the fact that an *unintended* victim was killed, defendant's act of shooting at Gonzalez from the vehicle established the requisite mental state for conviction of first degree murder under section 189.

murder of one another, and that the unlawful conduct of each was a substantial concurrent, and hence proximate, cause of Estrada's death, both could be convicted of the first degree murder of Estrada by operation of the doctrine of transferred intent. The Court of Appeal erred in concluding otherwise.

Nor does the record affirmatively demonstrate that the jury rested defendant's first degree murder verdict on any other unsupported theory of liability. (*Johnson, supra,* 6 Cal.4th at p. 42.) The jury was instructed, pursuant to the standard instruction on provocative act murder (CALJIC No. 8.12), that "A homicide committed during the commission of a crime by a person *who is not a perpetrator of such crime* in response to an intentional provocative act *with implied malice* by a defendant is considered in law to be an unlawful killing by such defendant." (Italics added.) Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. (*People v. Scott* (1988) 200 Cal.App.3d 1090, 1095 [246 Cal.Rptr. 406], and cases cited.)

Defendant and Gonzalez engaged one another in a gun battle on a public street in broad daylight, during which each plainly attempted to murder the other. Given that their respective claims of self-defense were rejected by the jury, *express malice* on the part of each was patently established. In contrast, the definition of provocative act murder in the instruction given would have been triggered by the finding of a provocative act that gave rise to an inference of *implied malice*. Given that defendant and Gonzalez were each convicted of first degree murder on facts plainly establishing express malice, there is no sound basis on which to conclude that the jury rested defendant's first degree murder verdict on a finding that he committed a provocative act with *implied malice*.

Nor is it logical to conclude such an implied malice murder would be elevated to first degree by operation of section 189. In *People v. Gilbert* (1965) 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365], we explained that provocative act implied malice murders are first degree murders when they occur during the course of a felony enumerated in section 189 that would support a first degree felony-murder conviction. (*People v. Gilbert, supra,* at p. 705.) Although section 189 was subsequently amended to make "murder perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle *with the intent to inflict death*" (§ 189, italics added) murder in the first degree, that provision by its very terms incorporates an express intent to kill requirement. It would have been anomalous for the Legislature to have intended section 189 to elevate a provocative act *implied malice* murder to first degree where the murder is

committed by intentionally discharging a firearm from a motor vehicle *with intent to inflict death*, i.e., with express malice. ▮▮▮▮ Given the facts, defendant's first degree murder conviction logically did not rest on a provocative act implied malice murder theory, elevated to first degree by operation of section 189.[11] The Court of Appeal's conclusion to the contrary was in error.

Finally, under the instructions given, in order to convict defendant of provocative act murder the jury would also have to find that Gonzalez, as the provoked shooter, was "not a perpetrator" of defendant's initial crime during which the homicide was committed. In one sense, both defendants might well be deemed "perpetrators" of the mutual crime—the simultaneous attempts to murder one another in a preplanned blaze of gunfire—that led to Estrada's death.[12] But even if we conclude Gonzalez was not a perpetrator of defendant's crime of attempted murder (of Gonzalez), Gonzalez was nonetheless found by the jury to have acted with his own express intent to kill in simultaneously premeditating and attempting the murder of defendant— hardly the state of mind of an innocent victim who resists and kills in response to a violent felony, as envisioned in the seminal provocative act murder cases. (See, e.g., *People v. Washington, supra,* 62 Cal.2d at p. 782 [innocent victim of gas station robbery provoked into shooting back]; *People v. Gilbert, supra,* 63 Cal.2d at p. 703 [police officer returns gunfire, killing

---

[11]As we have noted, under the provisions of section 189, on which the jury was also instructed, defendant need not have been found to have acted with premeditation in order to be held liable for first degree murder on a finding that he intentionally discharged his firearm from a motor vehicle with the intent to inflict death. (*Ante,* fn. 10, at p. 851.) Justice Kennard explains further that the circumstance that an innocent bystander was killed rather than the intended murder victim (Gonzalez) does not undermine defendant's liability for first degree murder under the statute: "Nothing in [section 189's] statutory language requires that the person killed be the person whom the defendant intended to kill; rather, it is enough that the defendant acted with the intent to kill the person at whom he or she was shooting." (Conc. opn. of Kennard, J., *post,* at p. 857.)

We recognize the jury in this case returned inconsistent sentence enhancement findings in connection with Gonzalez's convictions, and also found not true a sentence enhancement allegation that defendant "cause[d] the death of a person . . . as a result of discharging a firearm from a motor vehicle in the commission of a felony or attempted felony." (§ 12022.55.) This circumstance does not undermine our analysis on appeal. "[A]n inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, *or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense,* effect is given to both. (*United States v. Powell* (1984) 469 U.S. 57 [83 L.Ed.2d 461, 105 S.Ct. 471];[ citations]." (*People v. Santamaria* (1994) 8 Cal.4th 903, 911 [35 Cal.Rptr.2d 624, 884 P.2d 81], italics added; see also *People v. Nunez* (1986) 183 Cal.App.3d 214, 225-228 [228 Cal.Rptr. 64] [applying the rule to an enhancement finding].)

[12]Relevant to this conclusion is the circumstance that defendant and Sanchez each admitted the truth of the allegations that their crimes were committed for the benefit of a street gang. (§ 186.22, subd. (b)(1).)

fleeing robber's accomplice].) As Justice Kennard aptly reasons: "Significantly, we are not faced with a situation in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the person who induced the shooter to act. . . . Because defendant and Gonzalez had equally culpable mental states and engaged in precisely the same conduct at the same time and place in exchanging shots, it is not unfair to hold them equally responsible for Estrada's death, without regard to which of them actually fired the bullet that struck and killed Estrada." (Conc. opn. of Kennard, J., *post*, at p. 856.)

We conclude defendant's first degree murder conviction rested on one or more legally sufficient theories, and that the record does not affirmatively demonstrate the jury relied on an unsupported theory in reaching that verdict. Accordingly, defendant's murder conviction must be affirmed. (*Johnson, supra,* 6 Cal.4th at p. 42.)

## Conclusion

The judgment of the Court of Appeal is reversed, and the matter remanded for further proceedings consistent with the views expressed herein.

George, C. J., Kennard, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.**—I concur in the judgment holding that defendant was properly convicted of the first degree murder of Reynaldo Estrada. I write separately to clarify why his conviction is proper even though neither defendant nor his codefendant Gonzalez intended to kill Estrada and even though it could not be determined with the necessary degree of certainty whether defendant or Gonzalez fired the fatal shot. I write separately also to explain how this case differs from the companion case of *People v. Cervantes* (2001) 26 Cal.4th 860 [111 Cal.Rptr.2d 148, 29 P.3d 225], in which I concur in this court's opinion and judgment holding that Cervantes's first degree murder conviction was improper.

The majority gives a detailed summary of the relevant facts, which need not be repeated here, and it explains that the evidence at trial was insufficient to establish whether defendant or Gonzalez fired the bullet that killed Estrada, although it is certain that one or the other did. In this situation, a reviewing court must examine both possibilities—that defendant fired the fatal shot, and that codefendant Gonzalez did so—to determine whether the evidence supports defendant's conviction.

To support a criminal conviction, there must be sufficient evidence of both the criminal act and the required mental state. (Pen. Code, § 20 ["In

every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence"].) I consider first the criminal act requirement.

For first degree murder, the criminal act is "the unlawful killing of a human being." (Pen. Code, § 187, subd. (a).) If defendant fired the shot that struck and killed Estrada, then the criminal act requirement presents no difficulty: Defendant performed the prohibited act by killing Estrada, a human being. If Gonzalez rather than defendant fired the fatal bullet, the legal analysis is more complicated, although defendant's guilt is also established by sufficient evidence.

In legal terms, defendant committed the act of killing Estrada if his conduct was a legal or proximate cause of Estrada's death, even though codefendant Gonzalez fired the bullet that struck and killed Estrada. (See LaFave & Scott, Criminal Law (2d ed. 1986) § 3.12, p. 277 et seq.) Defendant and Gonzalez were members of rival gangs. By challenging Gonzalez with gestures and hand signals, and by firing his gun at Gonzalez, defendant engaged Gonzalez in a gun battle and induced Gonzalez to fire the shot that hit an innocent bystander, Estrada. In this sense, it is accurate to say that even if defendant did not fire the bullet that killed Estrada, nonetheless defendant's conduct caused Estrada's death.

The Court of Appeal recognized that if Gonzalez's bullet killed Estrada, it was defendant's conduct that prompted Gonzalez to shoot, and in that sense had also caused Estrada's death, but the court expressed the view that defendant's conduct could not be a proximate or legal cause of Gonzalez's actions. It reasoned that in convicting Gonzalez of first degree murder, the jury must have concluded that Gonzalez fired at defendant with a deliberate and premeditated intent to kill defendant. The Court of Appeal thought that this deliberate conduct by Gonzalez must in law be regarded as a "superseding cause" that cut off defendant's responsibility for any injury or death inflicted by the bullets that Gonzalez fired.

In law, the term "superseding cause" means "an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible." (Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 573, fn. 9 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Here, defendant and Gonzalez during their gun battle were attempting to kill each other, so that the killing of a bystander was a harm that both in kind and degree was within the risk that defendant and Gonzalez must have expected. Because they each expected and intended a death to occur, and a death did

occur in a manner that was entirely foreseeable, it does not matter, for purposes of determining proximate or legal cause under criminal law, that the person killed was not the precise object of their lethal intent.

Significantly, we are not faced with a situation in which the mental state of the person who fired the fatal shot was substantially more culpable than the mental state of the person who induced the shooter to act. Here, both defendant and Gonzalez acted with intent to kill, and the evidence was equally persuasive that for both of them the intent to kill was deliberate and premeditated. Because defendant and Gonzalez had equally culpable mental states and engaged in precisely the same conduct at the same time and place in exchanging shots, it is not unfair to hold them equally responsible for Estrada's death, without regard to which of them actually fired the bullet that struck and killed Estrada.

I consider next whether defendant had the required mental state for first degree murder. Under the statutory definition of that crime, the required mental state may take different forms. Here, the prosecution argued that defendant had the required mental state under either, or both, of two theories. The prosecution argued that in killing Estrada, defendant acted with a mental state sufficient for first degree murder because he had formed a deliberate and premeditated intent to kill Gonzalez, and because defendant killed by "discharging a firearm from a motor vehicle" at a person outside the vehicle with the intent to kill the person at whom the shot was fired. (Pen. Code, § 189.)

If defendant committed the prohibited act, either by firing or by inducing Gonzalez to fire the fatal shot, with a deliberate and premeditated intent to kill Gonzalez, then he had a mental state sufficiently culpable for first degree murder. Under the rule of transferred intent, as the majority explains, a defendant who intends to shoot and kill another but, because of bad aim, kills a different person is "just as guilty as if he had actually harmed the intended victim." (LaFave & Scott, Criminal Law, *supra*, § 3.12, p. 284; see also *People v. Scott* (1996) 14 Cal.4th 544, 549 [59 Cal.Rptr.2d 178, 927 P.2d 288].) For purposes of applying the rule of transferred intent, it does not matter whether defendant himself fired the fatal shot or instead induced or provoked another to do so; in either situation, defendant's culpable mental state is determined as if the person harmed were the person defendant meant to harm. (See *People v. Antick* (1975) 15 Cal.3d 79, 88-89 [123 Cal.Rptr. 475, 539 P.2d 43].)

Under the prosecution's other mental state theory—a killing while firing from a motor vehicle—it is unnecessary to apply the transferred intent rule.

Under the Penal Code, a murder is of the first degree if it was "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death." (Pen. Code, § 189.) Nothing in this statutory language requires that the person killed be the person whom the defendant intended to kill; rather, it is enough that the defendant acted with the intent to kill the person at whom he or she was shooting. Here, because defendant shot from a car at Gonzalez, who was outside the car, with the intent to kill Gonzalez, and because this conduct was the proximate or legal cause of innocent bystander Estrada's death, defendant had a mental state sufficiently culpable for a first degree murder conviction.

On the surface, this case resembles the companion case of *People v. Cervantes, supra,* 26 Cal.4th 860. In both, the defendant was a gang member who discharged a firearm at someone belonging to a rival gang. In both, the defendant's conduct induced additional gunfire in which a third person died. But this court has concluded that these similarities are less significant than other circumstances distinguishing the two situations, so that the defendant in *Cervantes* may not be convicted of the third person's murder. Here, defendant and Gonzalez were firing at each other when a bullet from one of their guns hit bystander Estrada. In *Cervantes,* the defendant fired at Linares, after which Linares's fellow gang members shot and killed Cabrera. Because the person at whom the defendant had fired (Linares) did not participate in the killing of Cabrera, and because Cabrera was not killed during an exchange of shots at a single time and place, proximate or legal causation is not established.

History sadly establishes that killings motivated by revenge may occur in cycles lasting many years and even generations. Although those whose conduct precipitates these vendetta cycles, and all who participate in continuing them, must bear moral responsibility for the ensuing bloodshed, the criminal law will not impose what in theory could be an unbounded liability for retaliatory killings, and courts must try to draw appropriate lines to mark the outer limits of legal causation in these situations. The court's decisions today in these two companion cases should begin to fix this line of demarcation separating mutual combat killings from retaliatory killings in the context of urban warfare between rival street gangs.

Werdegar, J., concurred.

**WERDEGAR, J.,** Concurring.—I agree with the analysis in Justice Kennard's concurring opinion, but write separately to explain the chief differences, as I understand them, between her analysis and that employed by the majority.

Justice Kennard correctly begins her discussion by noting that, because the evidence was insufficient to show who fired the fatal bullet, "a reviewing court must examine both possibilities—that defendant fired the fatal shot, and that codefendant Gonzalez did so—to determine whether the evidence supports defendant's conviction." (Conc. opn. of Kennard, J., *ante*, at p. 854.) Although this seems an elementary premise, one clearly articulated by the Court of Appeal, it has been lost on the majority in this court, which simply assumes what should be its conclusion, i.e., that defendant's criminal liability, on these facts, does not depend on whether his role in causing the bystander's death was direct or indirect.

The opinions continue to diverge from this point. Justice Kennard's discussion squarely addresses the problem of superseding cause, upon which the Court of Appeal believed the conviction foundered. (Conc. opn. of Kennard, J., *ante*, at pp. 855-856.) The majority sidesteps this question by characterizing the fatal acts of defendant and Gonzalez as "concurrent" causes of Estrada's death. (Maj. opn., *ante*, at pp. 845-849.)

Elegant as it may appear, the majority's solution is wrong. The undisputed fact is that this victim was hit by only one bullet. Whoever shot that bullet directly caused the victim's death. Whoever did not shoot that bullet could have caused his death only indirectly, i.e., by causing the actual perpetrator to shoot the bullet. That chain of causation may be compact enough in time, foreseeable enough, and close enough to the intended course of events to call the result proximate, but it remains a *causal sequence* rather than a concurrence of causes: one event happened, causing another to happen, in turn causing the death. Thus, whatever label we use, we cannot avoid the question that troubled the Court of Appeal: was the second event (the fatal shooting) so independent as to cut off the chain of proximate causation running from the first event (the malicious conduct that provoked the fatal shooting)? Was the fatal shooting, in other words, a superseding cause? As noted, Justice Kennard addresses this question; the majority does not.

Justice Kennard's discussion also recognizes that, if defendant did not directly shoot Estrada, his liability for Estrada's death must rest on conduct that "induced" or "prompted" Gonzalez to fire the fatal shot. (Conc. opn. of Kennard, J., *ante*, at p. 855.) While Justice Kennard avoids using the label, this is clearly "provocative act" liability. The majority, confusingly, suggests provocative act murder was an "unsupported theory of liability" (maj. opn., *ante*, at p. 852), though the majority does not explain in what respect the theory is unsupported by the evidence. Justice Kennard is thus better able to explain in what critical respects this case differs from the companion case, *People v. Cervantes* (2001) 26 Cal.4th 860 [111 Cal.Rptr.2d 148, 29 P.3d

225], in which the defendant's conviction was undisputedly based on a provocative act theory. (Conc. opn. of Kennard, J., *ante*, at pp. 856-857.)

Finding her analysis more logical and complete, I join Justice Kennard's concurrence rather than the majority opinion.