Filed 7/27/15  P. v. Corona CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>     v.<br><br>JOSE R. CORONA,<br><br>          Defendant and Appellant. | B255323<br><br>(Los Angeles County<br> Super. Ct. No. TA126545) |

APPEAL from the judgment of the Superior Court of Los Angeles County. Laura R. Walton, Judge.  Affirmed.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

While driving on a suspended license and with a blood alcohol content almost twice the legal limit, defendant and appellant Jose R. Corona collided with a motorcyclist near the center median of the 105 Freeway.  The motorcyclist died.  Immediately after the accident, defendant reversed back into traffic and left the scene, sometimes driving at high rates of speed, while weaving back and forth across multiple lanes of traffic.  About five miles from the scene of the accident, defendant stopped his car on the center shoulder of the freeway, partially blocking the carpool lane.  When law enforcement arrived, defendant was slumped over the steering wheel.  During field sobriety tests, defendant said several times that he was "f--ked up."

Defendant appeals from the jury verdict finding him guilty of second degree murder, gross vehicular manslaughter while intoxicated, leaving the scene of an accident and driving on a suspended license.  He claims there was insufficient evidence of causation on all counts, except driving on a suspended license, and insufficient evidence of implied malice to support second degree murder.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 9, 2013, at approximately 10:30 p.m., Kimelle Richard was driving westbound in the number one lane of the 105 Freeway at about 70 miles per hour. A motorcyclist passed in the carpool lane to her left.  At about the same time, the car directly in front of her braked suddenly.  Ms. Richard saw a white van ahead of that car veer slightly to the right, and then swerve "sharp[ly]" to the left into the carpool lane and the center divider, at which point the motorcyclist in the carpool lane ran into the side of the van.  From Ms. Richard's vantage point, it did not appear the motorcyclist had any way to avoid colliding with the van.

Ms. Richard was able to veer to the right away from the collision, and pulled over onto the right shoulder.  She saw the van reverse into the number one lane and drive off quickly.  Ms. Richard got off the freeway and called 911.

Brandon Patin was also on the freeway that evening, having just finished his shift as a Los Angeles County deputy sheriff.  Deputy Patin was in his personal car and was

2

driving in the number two lane. Traffic was fairly light. He noticed a white van approaching on his left side in the number one lane. As the van started to pass him, the driver appeared to lose control and "fishtail." The van veered into his lane and then abruptly swerved left into the carpool lane and center divider. As it did so, the van collided with a motorcycle driving in the carpool lane.

After the collision, Deputy Patin slowed down and stopped. Looking in his driver's side mirror, he saw the van back away from the center divider, pull back onto the freeway and drive off. Deputy Patin followed the van as he dialed 911. The van made an "abrupt move across all lanes of traffic." Deputy Patin thought the driver might be trying to get off the freeway. However, instead of exiting, the van drove along the right shoulder, appearing to scrape the bumper or tires along the wall, then pulled back into traffic and sped up to 80 miles per hour. The van weaved in and out of traffic before veering back onto the center shoulder where it stopped, with the back end partially blocking the carpool lane.

Deputy Patin waited in his car behind the van for law enforcement to arrive. After a few minutes, Abel Baca, an officer with the California Highway Patrol (CHP), arrived, as did several deputies from the Los Angeles County Sheriff's Department. The officers walked up to the van and found defendant slumped over the steering wheel. Defendant did not respond to multiple knocks on the window. He eventually woke up and put his hands on the steering wheel, and "began moving the steering wheel as if he was driving." Defendant did not respond to instructions to open the door and Officer Baca saw that the car's transmission was not in park. Officer Baca therefore broke the front passenger window to gain access to the van. He then put the car in park, and removed defendant from the van.

Shortly thereafter, Jason Walker, another CHP officer, arrived. He had already been to the scene of the collision and was advised that the motorcyclist had been taken away by paramedics. Officer Walker spoke with Deputy Patin and Officer Baca about what they had observed, and then turned to defendant who had been placed in the back of one of the patrol cars.

3

Officer Walker immediately noticed that defendant's eyes were "red and watery," his speech was "very slurred" and he smelled of alcohol. Defendant also had minor abrasions on his face and hands. Officer Walker had defendant get out of the patrol car and perform five field sobriety tests. Defendant's performance of each of the four physical tests showed impairment. Several times during the tests, when he lost his balance or could not complete a test, defendant said "I know, I'm f--ked up." Defendant said he was sorry, he "didn't mean to," and that he would pay what he could but he was just tired and wanted to go home. The fifth test, a preliminary alcohol screening test, sampled defendant's breath and registered a blood alcohol content of 0.15. A second test taken a couple of minutes later registered 0.14. When asked if he had had anything to drink, defendant said he had two 12-ounce cans of beer, and he had eaten. Defendant told Officer Walker he thought he may have hit a bumper in the road or something similar, and made reference to the fact he thought it was New Year's Eve. (It was January 9.)

Defendant was placed under arrest. At the CHP station, defendant was given a further alcohol screening test and those results showed defendant's blood alcohol content at 12:24 a.m. to be 0.15. At this same time, Officer Walker was told by his dispatcher that the motorcyclist had passed away from his injuries.

Defendant was charged by information with second degree murder (Pen. Code, § 187, subd. (a); count 1), gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a); count 2), leaving the scene of an accident (Veh. Code, § 20001, subd. (a); count 3), and driving on a suspended license (Veh. Code, § 14601.5, subd. (a); count 4). It was also specially alleged as to count 2 that defendant fled the scene of the accident within the meaning of Vehicle Code section 20001, subdivision (c), and had suffered two prior convictions for driving under the influence within the meaning of Penal Code section 191.5, subdivision (d).

Defendant pled not guilty and denied the special allegations.

The case proceeded to a jury trial in February 2014. The prosecution presented the above facts. During Officer Walker's testimony, a video from the patrol car's dashboard camera of Officer Walker's interview with defendant was played for the jury.

The prosecution also called Deputy District Attorney David Gammill. Mr. Gammill was the prosecutor who obtained a conviction against defendant in July 2010 for driving under the influence. Mr. Gammill explained that defendant entered into a plea agreement in that case and, as part of the plea, was instructed by the court with a *Watson* admonition,[1] including the following language: "You should understand that being under the influence of alcohol or drugs or both impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both. [¶] If you continue to drive while under the influence of alcohol or drugs or both and as a result of that – of your driving someone is killed, you could be charged with murder." Mr. Gammill also testified defendant's driver's license was suspended as a result of that prior conviction, and that he was still on probation from that conviction when this incident occurred.

Glen Whelan, Director of Quality Assurance for Safety Consultant Services testified. His company offers various programs, including an 18-month course for individuals who incur a second offense for driving under the influence. The course is referred to as an "SB38" program. Defendant first enrolled in an SB38 program in November 2010, but thereafter was terminated multiple times for failing to attend. Defendant returned multiple times to re-start the program, but was terminated each time for lack of attendance. Each time he re-enrolled, defendant was allowed to pick up with classes where he left off, but he only completed about 15 months of the program. During that time period, defendant signed at least eight different forms acknowledging the *Watson* admonition about drinking and driving, and part of the program material he completed included instruction on the dangers of driving while intoxicated.

---

[1] *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).

Daphne Teamer of the Department of Motor Vehicles testified that at the time of the incident defendant's driver license was suspended due to a prior incident of driving under the influence. Evidence was also presented regarding defendant's two prior convictions for drunk driving in July 2003 (case No. O3NM09491) and in July 2010 (case No. OEA06336). Testimony was presented on the effects of alcohol consumption on driving ability, including impairment of judgment and slowed response times.

Defendant called James Bertoch, an expert in accident reconstruction, to testify to the mechanics of the accident. Mr. Bertoch opined that the "accident happened because the van [came] skidding across the [carpool] lane and the motorcyclist had nowhere to go and ended up hitting the side of the van." Mr. Bertoch also attested that given the relatively large size of the van, with no back side windows, the relatively small size of the motorcycle, and the fact the van almost immediately hit the center median at the same time the motorcycle hit the side of the van, it was possible that the driver of the van did not realize he had collided with the motorcyclist.

Defendant called several other witnesses, including his sister to testify to his good character, but we have summarized only the facts and testimony material to the two substantial evidence questions presented. Defendant did not testify.

The jury found defendant guilty on all four counts and found the special allegations true. Defendant waived his right to trial on the prior conviction allegations, and admitted them to be true. The court sentenced defendant to a state prison term of 20 years to life.

This appeal followed.

**DISCUSSION**

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial

6

evidence." (*Ibid*.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; accord, *People v. Manriquez* (2005) 37 Cal.4th 547, 577.)

## 1.      Causation

Defendant contends there is no substantial evidence of causation supporting the verdicts on count 1 (second degree murder), count 2 (gross vehicular manslaughter), and count 3 (leaving the scene). We disagree.

The Supreme Court has explained "there is no bright line demarcating a legally sufficient proximate cause from one that is too remote. Ordinarily the question will be for the jury." (*People v. Cervantes* (2001) 26 Cal.4th 860, 871.) "In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' [Citation.]" (*Id*. at p. 866.) There may be more than one proximate cause. " ' "A cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death." ' [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 847.) "In criminal prosecutions, the contributing negligence of the victim or a third party does not relieve the criminal actor of liability, unless the victim's or third party's conduct was the *sole or superseding cause* of the death." (*People v. Autry* (1995) 37 Cal.App.4th 351, 360.)

The gist of defendant's argument is that there was no evidence he caused the accident. Rather, the evidence demonstrated that the motorcyclist had been speeding and was unable to avoid colliding with defendant's van because of his excessive speed, while Ms. Richard had been able to avoid the collision. The argument lacks merit.

There was no evidence the motorcyclist was driving at an excessive speed. There was only evidence from Ms. Richard that she was driving about 70 miles per hour and that the motorcyclist was proceeding straight in the carpool lane next to her and was just starting to pass her when the collision occurred. Even Mr. Bertoch, the expert relied upon by defendant, testified that the accident occurred because defendant veered into the carpool lane in front of the motorcyclist, leaving the motorcyclist with no way to avoid

hitting the side of the van. The evidence was uncontroverted that defendant was the one driving erratically and the proximate cause of the collision. Even if we assume, solely for the sake of argument, that the victim was driving over the posted speed limit, such conduct, given the totality of evidence presented, would be, at most, a potential *concurrent* cause of the collision. The record contains ample, if not overwhelming, evidence upon which the jury reasonably concluded that defendant's conduct was the primary and substantial factor in the collision and the victim's resulting death.

**2.      Implied Malice**

Defendant argues the record contains insufficient evidence of implied malice warranting reversal of his conviction for second degree murder. We are not persuaded.

Murder requires proof of malice, either express or implied. "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.] *In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less*." (*People v. Knoller* (2007) 41 Cal.4th 139, 143, italics added; accord, *People v. Elmore* (2014) 59 Cal.4th 121, 133.) Stated another way, implied malice has " 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." [Citation.]' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*).)

Defendant's argument hinges on the contention that even the prosecutor told the jury he did not believe defendant intended to kill when he got into the van that night. But that is wholly irrelevant to whether there is substantial evidence of implied malice. To establish implied malice, there need not be any intent to kill.

There was uncontroverted evidence that defendant performed an act, the natural consequence of which was dangerous to human life. (*Chun*, *supra*, 45 Cal.4th at

8

p. 1181.)  Defendant got into a van after consuming alcohol, and drove recklessly and at high rates of speed on the freeway in the presence of other drivers.  Defendant's blood alcohol content was almost twice the legal limit.

There was also substantial evidence defendant was aware such conduct was dangerous to human life.  (*Chun*, *supra*, 45 Cal.4th at p. 1181.)  Defendant had two prior convictions for drunk driving.  Defendant had been instructed with the *Watson* admonition in court in July 2010 after the second of those convictions that such conduct was dangerous to human life, and that if his driving resulted in a death, he could be charged with murder.  Defendant participated in the SB38 program which included instruction on the dangers of drunk driving, and he signed at least eight separate forms containing the *Watson* admonition, acknowledging his understanding of that fact.  Defendant provides no cogent argument for how this evidence is insufficient to support the jury's finding on implied malice.

### DISPOSITION

The judgment of conviction is affirmed.


                                                                    GRIMES, J.

WE CONCUR:

                    BIGELOW, P. J.



                    FLIER, J.


9