Filed 10/15/21  P. v. Reyes CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>     v.<br><br>MIGUEL ANGEL REYES,<br><br>   Defendant and Appellant. | G059720<br><br>(Super. Ct. No. 20NF1176)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick Donahue, Judge.  Affirmed.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L Garland, Assistant Attorney General, Arlene A. Sevidal, Andrew S.

Mestman and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

*     *     *

Miguel Reyes was convicted of voluntary manslaughter in the stabbing death of a 17-year-old female acquaintance. The stabbing was the culmination of a series of events after the victim and a group of other teenagers had converged on Reyes to escort him out of their neighborhood when he was seen acting aggressively toward the victim and her friends and had taken her knife. The victim threw a brick at Reyes as he walked away. Reyes turned and threw the brick back at her; he then rushed her with the knife. Reyes claimed the stabbing was in self-defense and that he lacked any conscious intent.

Reyes now contends his conviction should be reversed because his counsel was ineffective in failing to request that the prosecutor agree to instruct the jury on involuntary manslaughter as a lesser related offense. In making this argument, Reyes assumes the prosecutor would have agreed to the lesser related instruction if asked. The record does not support that assumption.

As the Attorney General points out, the prosecutor evidenced a willingness to instruct the jury on involuntary manslaughter as a lesser *included* offense of voluntary manslaughter, but only because he had initially misread an unpublished decision of this court; he was seemingly concerned that if the jury were not given the lesser included instruction, this court's apparently unique perspective, as evidenced by that unpublished opinion, might prompt reversal of a conviction for voluntary manslaughter.

The prosecutor gave no indication he was interested in adding involuntary manslaughter as a lesser *related* charge when defense counsel suggested the possibility. Instead, the prosecutor made clear he did not believe the facts of the case were consistent with a charge of involuntary manslaughter. Thus, when the misunderstanding about the unpublished case was resolved, the issue disappeared.

2

In any event, we conclude there was no probability the outcome would have been different if the instruction had been given. Reyes stabbed his victim four times, including twice on or around her neck, which appeared to demonstrate a conscious disregard for her life. Reyes argues the evidence is also sufficient to support the conclusion he had no such intent, due to a "fight or flight" reaction. He therefore contends that, had the jury been instructed on involuntary manslaughter, it could have concluded he acted without any specific intent and was as a result guilty only of the lesser charge. But Reyes already made that argument to the jury in an effort to obtain an acquittal on the voluntary manslaughter charge. The jury's verdict indicates it rejected the argument. There is no basis in this record to conclude the jury would have evaluated the same evidence differently if instructed on involuntary manslaughter.

Reyes also argues the court abused its discretion when it sentenced him to an aggravated term of 11 years for voluntary manslaughter. The Attorney General contends the claim is waived because Reyes did not object when the sentence was imposed. We agree. However, even if it were not waived, we would find no abuse of the court's discretion under these circumstances. We consequently affirm the judgment.

**FACTS**

1.    *The Incident*

On the evening of May 16, 2020, Reyes—then age 23—was at a park in Anaheim with three teenage females, smoking marijuana. Reyes and 17-year-old Jolina had also ingested Xanax. Reyes told Jolina he wanted her to be his girlfriend; she rebuffed him, and he appeared to be upset.

A few minutes later, a group of young males approached and accused Reyes and his friends of "tripping" on them; Jolina got into an argument with one of them. During the argument, Reyes somehow took possession Jolina's knife. After the argument ended, as the males were walking away, Reyes tried to sell them marijuana.

3

Jolina became angry at Reyes for his perceived friendliness to the males. When Reyes started to walk away, Jolina asked for her knife back. Reyes replied he would return it when Jolina was sober. She responded with anger and the two argued. One of the other females grabbed Reyes's backpack, which contained marijuana. She told him she would return the backpack when he returned Jolina's knife.

When Reyes again tried to leave, the females surrounded him, and he began pushing the youngest of them, who was 16. She hit him; he hit her back. Her older sister—the one who had taken the backpack—joined in and the three of them started fighting. When the fight ended, the females walked toward a skatepark with the backpack. Reyes followed them.

A teenage male skater at the skatepark saw the fight between Reyes and the females; he realized he knew Jolina and told Reyes to leave the females alone. Reyes responded by aggressively putting his hands on the skater; the skater then punched Reyes, dropping him to the ground. Other skaters, as well as Jolina, kicked Reyes.

After the kicking stopped, Reyes got up, pulled out the knife and began chasing the skaters, who backed off. Reyes again demanded his backpack, but the females would not give it to him. As Reyes walked away, he slipped and fell; some people laughed.

Reyes then came back to Jolina and told her, "I'm going to your house. I'm coming for you." They exchanged words; Jolina was angry.

The skaters walked toward the community center and Reyes, still holding the knife, followed them. As they walked up an alley, the teenage skater who had confronted Reyes walked backward to keep an eye on him. Other "kids" joined the group, and the skater felt some responsibility to protect them against Reyes. He told Reyes if he dropped the knife, they could fight. Reyes refused, pointing out "there is a lot of you." The skater promised Reyes if they fought without weapons, it would just be the two of them, but he thought Reyes was "scared."

4

The skater and other kids circled Reyes, who denied having the knife and started to walk away. The group followed and Reyes began to run. Someone then handed the skater a long wooden board, which he carried as he followed Reyes into an alley. When Reyes reached a dead-end, the skater told him, "you are trapped. There is nowhere else to go." However, Reyes was able to jump over a low wall as the skater swung at his leg with the board; Reyes fell to the ground on the other side.

The skater followed Reyes over the wall. He testified he did not want to leave Reyes alone in their neighborhood with a knife as "there are always kids running around." The group followed Reyes down the street as he walked away. Another young skater who had joined the group then "slapped [Reyes] with [his] skateboard," "hit[ting] him pretty hard."

As they continued walking, the first skater learned a female in the crowd was calling the police; he told her to "tell the police he had a knife and he hit a girl." The skater was trying to stay close to Jolina because he was scared Reyes was after her. However, Jolina was behind the skater when she picked up a brick, ran forward, and threw it at Reyes, hitting him in the upper back.[1] Reyes responded by picking up the brick and throwing it back toward Jolina and the skater, but it hit neither of them.

At that point, Jolina was still closer to Reyes than anyone else, and he suddenly charged toward her. Reyes grabbed Jolina by her sweatshirt, pulled her toward him and stabbed her. Jolina attempted to fight back and get away, but Reyes would not let go of her.

After Reyes stabbed Jolina, he stared at her for 15 to 20 seconds; he then walked away toward a nearby apartment complex. Reyes was observed by a police officer in a helicopter walking with a white shirt over his shoulder. He then entered a

_____

[1] A second person picked up another brick at about the same time the victim picked up hers. It is unclear whether he threw it at Reyes. If he did, there is no evidence Reyes was aware of it.

nearby carport. The helicopter observer notified officers on the ground where Reyes was, and he was taken into custody.

When officers searched the carport Reyes was seen entering, they found a white shirt with what appeared to be blood on it. A resident of the apartment building later spotted a knife in the swimming pool that had not been there earlier in the day, notified the police, and the weapon was retrieved.

Jolina's stab wounds were fatal. An examination revealed she had been stabbed four times—once in the right chest, which was the fatal blow, once in the left back, once in the right face and neck, and once in the right forearm.

After Reyes was taken to the police station, he initially denied any involvement in the stabbing, claiming he had been suddenly attacked by a group of guys with "big old sticks." He claimed that because he had nothing but his keys to defend himself with, he ran away to the apartment building where the police later found him. He then changed his story and admitted he had a knife that he claimed Jolina had given to him. He asserted that after he was jumped, he had just stabbed someone in self-defense, but he did not know who it was because it was dark, and his vision was poor. He claimed he thought the person he stabbed was just "one of the guys" in the group "trying to kill me." Reyes later conceded he was frustrated at Jolina because of the way she was acting and for taking his backpack; he acknowledged things "got out of hand."

Reyes was charged by information with one count of voluntary manslaughter. (Pen. Code,[2] § 192, subd. (a).) The information also alleged Reyes personally used a deadly weapon (§ 1192.7) and that he committed the offense during a period he was released on his own recognizance on a primary felony (§ 12022.1, subd. (b)).

_____

[2]    All further statutory references are to this code unless otherwise designated.

2.    *The Defense Evidence on "Fight or Flight"*

Reyes did not testify at trial. Instead, the defense offered the testimony of Dr. Scott Fraser, who explained the "fight or flight" reaction that occurs "when there is perceived or actual threat that impinges on us."

Fraser explained that when a person is faced with a perceived threat, which he does not feel capable of thwarting, his first reaction is to flee. However, when flight does not seem possible, either because there is no escape route available or due to pursuit, he may elect to fight instead.

Fraser also explained that during a fight or flight reaction, the body redistributes its resources, including blood flow, away from the brain to the parts of the body needed to address the danger. That reaction "compromise[s]" the person's ability to evaluate what is happening and make decisions and thus a person under high stress is "not capable" of "decision-making with foresight, evaluation, and potential consequences and options." He also explained that a person undergoing this reaction has a very limited focus, is unable to evaluate details, and will have a very poor memory of what happened.

Fraser stated that while the ingestion of Xanax would not prevent a person from experiencing a fight or flight reaction, it would likely delay the triggering of that reaction and have a calming effect. He also agreed that if a person had ingested Xanax, marijuana, and alcohol, the combination could cause a person to perceive a greater danger than an unimpaired person would perceive.

Although Fraser stated he had reviewed the evidence, including various videos that captured the series of events leading up to Reyes stabbing of his victim, he did not offer any opinion about whether those circumstances, or Reyes's reaction to them, were consistent with a "fight or flight" reaction. Instead, he stated that the purpose of his testimony was "to describe the human alarm reaction pattern. So that the jurors could understand that this is a normal way in which any of us would react under high stress conditions."

7

Under cross-examination, Fraser acknowledged that if a person who had been knocked down at a skate park were able to walk away, but then doubled back toward his attackers, that would not be consistent with a "fight or flight" reaction. Similarly, if that same person decided to follow his attackers as they walked away, that would not be consistent with a "fight or flight" reaction.

3. *Instructing on Involuntary Manslaughter as a Lesser Included Offense*

Near the conclusion of the trial, the trial court directed the parties' attention to this court's unpublished decision in *People v. Rivera* (Sept. 13, 2019, G055218) (*Rivera*), which had reversed a conviction for voluntary manslaughter and remanded the case for a retrial with directions to also instruct the jury on involuntary manslaughter as a lesser included offense of the original murder charge. The trial court seemed concerned there could be a similar result in this case and encouraged the parties to collaborate on proposed instructions regarding involuntary manslaughter as a lesser included offense of the charged crime of voluntary manslaughter.

However, because involuntary manslaughter is not a lesser included offense of voluntary manslaughter (see, *People v. Orr* (1994) 22 Cal.App.4th 780, 784-785), the parties were unable to agree on appropriate instructions. Noting that no published case had viewed involuntary manslaughter as a lesser included offense of voluntary manslaughter, the trial court indicated it was not inclined to instruct the jury as though it were.

Reyes's counsel did not disagree with the court's legal point but responded that she believed the court could still instruct on involuntary manslaughter and argued the evidence would support a finding of involuntary manslaughter: "if the jury were to reject the lawful self-defense claim, they may, in light of Dr. Fraser's testimony and all the other facts, view the conduct more consistent with gross negligence . . . . [¶] . . . They could have a reasonable doubt [that] Mr. Reyes . . . was grossly negligent in attempting to protect himself much like they talk about in *Rivera.*"

8

She also asserted that she had "indicated early on I was asking for [an involuntary manslaughter instruction]. My understanding was the court indicated it was inclined to give it. And I think the People indicated, although they didn't agree with the reasoning of it based on *Rivera*, that it should be given." The court corrected her, however, pointing out that there had been no discussion about an involuntary manslaughter instruction before the court itself had brought up *Rivera* and suggested involuntary manslaughter might be viewed as a lesser included offense by this court. The court then noted *Rivera* appeared to be distinguishable from this case, given that the charged crime in *Rivera* had been murder, rather than voluntary manslaughter.

The court asked the prosecutor to weigh in, and he responded by focusing on *Rivera*'s potential impact on this case, while ignoring the suggestion made by defense counsel that the jury could still be instructed on involuntary manslaughter even if it was not a lesser included offense. He stated that while he thought *Rivera* was inconsistent with published case law on lesser included offenses, he had concerns it might indicate this court would apply "a similar type of analysis . . . in our case." On the other hand, the prosecutor believed it was problematic to try to instruct on involuntary manslaughter as a lesser included offense if it necessitated changing the elements of that crime. He also viewed the facts of this case as distinguishable from those in *Rivera*, stating it would be "difficult for a reasonable jury to conclude that stabbing somebody four times, twice near the throat . . . is not inherently dangerous to human life."

The prosecutor concluded with this: "I guess that's my roundabout way of saying I candidly don't know what the appropriate course is in light of *Rivera*. So, you know, I defer to the court and the defense on this. Because, ultimately, I don't want, if there is a conviction, the thing winding up like *Rivera*. [¶] But at the same time, if there is a conviction, I don't want a challenge to the manner in which the jury was instructed on elements that we are mostly making up with respect to invol. And I think we are

9

making them up out of – with some basis in the law consistent with what we think *Rivera* says, but that's a novel approach."

After further discussion about what the proposed "lesser included" version of the jury instructions might look like, the court rejected the idea of giving them. The court pointed out that "[t]he *Rivera* case, when I went back and looked at it, it is clear to the court . . . that it talks about invol in the context of murder. So that's what was instructed in that case. [¶] So I don't think it applies to . . . this case [which] is charged as a voluntary manslaughter and that's what it is going to go to the jury on with the standard instruction."

4. *Closing Arguments, Verdict, and Sentencing*

In his closing argument, the prosecutor argued Reyes stabbed Jolina out of anger. He portrayed her decision to throw a brick at his back as the last straw in what must have felt like an extended campaign by a bunch of kids to taunt and humiliate—but not actually injure—Reyes as they escorted him out of their neighborhood. "They didn't use these weapons to try to kill someone or to try to pummel someone. Nobody knows that better than [Reyes]. They used these weapons first to counter him and then, call it what it is, they used them to humiliate him. To slap him when his back was turned. To follow him, to make sure that nobody got hurt. To make sure that knife he was clutching didn't wind up killing someone. [¶] Jolina was the last straw. We all understand she didn't have to throw the brick. . . . [¶] But [Reyes], when he gets hit, he is not reacting because he is scared to death. He is reacting because he is angry as hell. There is a term for that type of anger and it isn't self defense. It is heat of passion. It is manslaughter."

Reyes's counsel had a more sinister take on the group's conduct. She claimed the prosecutor "made a valiant attempt to try to justify or make those skaters' actions that night acceptable. But it wasn't. Their actions were not acceptable and their actions led to what happened to Jolina R. that night."

10

Defense counsel argued Reyes was not guilty of voluntary manslaughter for two reasons. First, he "acted in lawful self-defense" because a large group of aggressive people was "chasing him. He acted, reacted to the hit of concrete at his back, the rush of a person behind him."

Second, he was not guilty of voluntary manslaughter because he had no specific intent to kill. Counsel emphasized the prosecutor had the burden of proving every element of the crime beyond a reasonable doubt, and she concluded the People had failed to establish that Reyes acted with the requisite intent. "Miguel Reyes did not have the specific intent to kill Jolina R. And he did not act with deliberate, conscious disregard for human life. Those are all the elements that the people must prove beyond a reasonable doubt. And they have failed to do that." Specifically, counsel claimed Reyes was in "instinctual mode. He was not thinking. He was not using intent in his actions . . . ." She relied on Fraser's expert testimony about the "fight or flight" reaction to argue that "in that moment [Reyes] is not weighing possible alternative solutions." Therefore, his decision to stab Jolina was "not a deliberate, thought-out, conscious disregard or action."

The case went to the jury on the charge of voluntary manslaughter. The jury found Reyes guilty of that charge. The jury also found true the allegation that he personally used a deadly weapon.

The court sentenced Reyes to 12 years, which was comprised of the upper 11-year term for voluntary manslaughter, plus an additional year for his use of a deadly weapon. The court explained its reasons for imposing the upper term, noting that Reyes had an extensive criminal record, beginning as a juvenile. He was "on two grants of informal probation when this incident took place." Moreover, Reyes's "prior convictions as an adult or sustained petitions in juvenile delinquency petitions are numerous and in increasing seriousness." The court pointed out Reyes had "something like five, five prior felonies as well as, you know, seven misdemeanors. The criminal history was

11

extensive." Citing California Rules of Court, rule 4.412 (b)(2), the court selected the upper term.

## DISCUSSION

Reyes first contends his trial counsel was ineffective because she failed to seek the prosecutor's agreement to instruct the jury on involuntary manslaughter as a lesser related offense, after the court concluded it would not instruct on it as a lesser included offense. "'To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him.'" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1052–1053.)

We need not address the question of deficient performance because we conclude Reyes has failed to demonstrate a reasonable probability that soliciting the prosecutor's agreement would have produced a more favorable verdict.

1. *Background Law*

Murder is an unlawful killing done with malice aforethought. (§ 187, subd. (a).) "[M]alice may be express or implied. [¶] [It] is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) Malice is implied when the defendant engages in conduct dangerous to human life, "'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.'" (*People v. Bryant* (2013) 56 Cal.4th 959, 965 (*Bryant*).)

"A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to

12

manslaughter." (*Bryant, supra,* 56 Cal.4th at p. 968; see also *People v. Milward* (2011) 52 Cal.4th 580, 587 (*Milward*) [malice is "negated"].) And malice is mitigated or negated "when the defendant kills as a result of provocation or in 'imperfect self-defense.'" (*Milward, supra*, at p. 587; see § 192, subd. (a); see also *Bryant, supra,* at p. 969 [referring to provocation as "sudden quarrel or heat of passion"].)

Involuntary manslaughter, by contrast, is the unlawful killing of a human being without malice, either express or implied. (§ 192; *People v. Brothers* (2015) 236 Cal.App.4th 24, 31 (*Brothers*).)

Both voluntary manslaughter and involuntary manslaughter are lesser included offenses of the crime of murder (*People v Rios* (2000) 23 Cal.4th 450, 460 ["California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter"]), but as to each other, "[t]hey are merely siblings who have a common parent." (*People v. Orr, supra*, 22 Cal.App.4th at p. 785.)

The trial court has a sua sponte duty to not only instruct the jury on the crime charged, but also on any lesser included offenses "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) The court has no corresponding duty to instruct on lesser related (i.e., "sibling") offenses. Indeed, the court cannot instruct on such offenses unless the prosecutor agrees because it is the province of the prosecutor to decide which separate offenses are charged. (*People v. Birks* (1998) 19 Cal.4th. 108, 134-135, fn. 18.)

2.    *Whether There was Ineffective Assistance in This Case*

Recognizing that the court could not instruct on involuntary manslaughter as a lesser related offense without the prosecutor's agreement, Reyes claims his trial counsel was ineffective for failing to ask for that agreement. He presumes the prosecutor would have agreed, based on his stated willingness to acquiesce if both the defense and

13

the trial court believed it was appropriate to instruct on involuntary manslaughter as a lesser *included* offense.  We disagree.

If the trial court had ultimately concluded that involuntary manslaughter should be treated as a lesser included offense based on the unpublished *Rivera* opinion, it would likely have determined it had a sua sponte duty to instruct on that crime whether or not the prosecutor agreed.  The prosecutor seemingly understood that.  The prosecutor nonetheless made clear he did not think the facts of this case fit an involuntary manslaughter charge.  Once the "lesser included" question was resolved, the prosecutor showed no interest in an involuntary manslaughter instruction.

Indeed, the prosecutor presumably was aware he could avoid whatever uncertainty was created by the *Rivera* opinion by agreeing to instruct on involuntary manslaughter as a stand-alone offense.  But the prosecutor never suggested doing so, indicating he was not amenable to that option.  We consequently reject Reyes's suggestion that if his trial counsel had solicited the prosecutor's agreement to an instruction on involuntary manslaughter as a separate offense, the prosecutor would have acquiesced.

In any event, we conclude Reyes has not established a reasonable probability that, if the involuntary manslaughter instruction had been given, the verdict would have been more favorable to him.  According to Reyes, the evidence in this case was consistent with involuntary manslaughter because "[g]iven the heated atmosphere surrounding the fatal incident—appellant, high on Xanax and being hit and chased by a mob armed with potentially deadly weapons—a jury readily could have found that [he] acted unthinkingly, without an intent to kill and without a conscious disregard for life.  It could have found his conduct as merely assaultive.  In such a circumstance, he could be convicted of involuntary manslaughter in the commission of an inherently dangerous assaultive felony."  But that is the exact argument Reyes made to the jury.  Had the jury found it persuasive, it would have acquitted him of the voluntary manslaughter charge.

14

As defense counsel pointed out in her closing argument, the jury was instructed that the prosecutor had the burden of proving every element of that offense—including that Reyes acted with the requisite conscious intent when he stabbed Jolina—and that if all of those elements were not proved, its duty was to acquit Reyes of voluntary manslaughter. We must presume the jury followed those instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

This record does not support the conclusion that it is reasonably probable the jury would have convicted Reyes of involuntary manslaughter, rather than voluntary manslaughter, if given that option. What it does demonstrate is that the jury did not view Reyes's assertion that he lacked any intent to kill as persuasive enough to raise a reasonable doubt. There is no reason to conclude the jury would have viewed that same evidence in a different light if it had been instructed on involuntary manslaughter.

3. *Sentencing Reyes to Upper Term*

Reyes also contends the trial court abused its discretion by sentencing him to the upper term for voluntary manslaughter because the aggravating factor relied upon by the court "does not outweigh the mitigating factors."

However, as the Attorney General argues, such a claim is waived if it is not raised in the trial court when the sentence is imposed. In *People v. Scott* (1994) 9 Cal.4th 331, 353 (*Scott*), our Supreme Court held the waiver doctrine applies to claims wherein the trial court "purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons." (*Scott* at p. 353.)

As the Supreme Court explained, "the purpose for requiring the court to orally announce its reasons at sentencing is clear. The requirement encourages the careful exercise of discretion and decreases the risk of error. In the event ambiguities, errors, or omissions appear in the court's reasoning, the parties can seek an immediate clarification

15

or change." (*Scott*, *supra*, 9 Cal.4th at p. 351.) The time for a party to seek such a clarification or change is when the court explains the reasons for its sentencing decision.

Reyes claims he preserved the issue below by arguing for a lesser term before the court announced its decision and gave its reasons. We are not persuaded. His arguments were made before the court announced its sentencing decision. This cannot be construed as an objection to the way in which the court weighed the competing sentencing factors.

But even if the issue were not waived, we would not find any abuse of discretion. "Generally, determination of the appropriate term is within the trial court's broad discretion [citation] and must be affirmed unless there is a clear showing the sentence choice was arbitrary or irrational [citation]. 'Sentencing courts have wide discretion in weighing aggravating and mitigating factors [citations], and may balance them against each other in qualitative as well as quantitative terms.' [Citation.] One factor alone may warrant imposition of the upper term [citation] and the trial court need not state reasons for minimizing or disregarding circumstances in mitigation [citation]." (*People v. Lamb* (1988) 206 Cal.App.3d 397, 401.)

A court's sentencing decision will not be disturbed on appeal unless appellant can show that the sentencing decision "is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) The fact that other courts might have weighed the aggravating and mitigating factors differently, and perhaps could have sentenced Reyes to a lesser term, does not establish that this court's view of those factors was arbitrary or irrational. Different courts can, and do, view the same sentencing factors in different ways. Reyes points to no cases finding an abuse of discretion under circumstances similar to these. Likewise, we have found none.

16

## DISPOSITION

The judgment is affirmed.


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.

17