Filed 11/18/22  P. v. Zamora-Canada CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090890 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE021333) |
| v. | |
| GERMAN ZAMORA-CANADA, | |
| Defendant and Appellant. | |

Defendant German Zamora-Canada (defendant) and codefendant Julian Garcia (Garcia) left a Sacramento area nightclub and were driving away when they received a phone call from a man who was with them at the club.  A short time later, they returned to the club's parking lot armed with handguns.  An argument ensued near a taco truck between defendant, Garcia, and an intoxicated group of men who were acting belligerently and picking fights outside the club.  In response, defendant and Garcia drew their guns and started shooting at the unarmed members of the victim group.  Three people suffered nonfatal gunshot wounds.  An innocent bystander who worked in the taco truck suffered multiple gunshot wounds and died.

1

Defendant was charged with murder (§§ 187, subd. (a)—count one),[1] three counts of attempted murder (§§ 664, 187, subd. (a)—counts two, three & four), and being a felon in possession of a firearm. (§ 29800, subd. (a)(1)—count six.) After trial, the jury found defendant guilty of second degree murder and one count of attempted murder, both with firearm enhancements. The jury also found defendant guilty of being a felon in possession of a firearm. In a bifurcated trial, the court found true that defendant suffered a prior strike conviction. The court sentenced defendant to a total aggregate term of 99 years four months to life in prison.

On appeal, defendant argues there was insufficient evidence to support his convictions for attempted murder and murder and that the court erroneously instructed the jury regarding causation. He also argues that the trial court erred in denying his motion for a mistrial after a prosecution witness breached a pretrial in limine ruling. Finally, he contends that his sentence must be vacated and the matter remanded for a new sentencing hearing because he was constructively denied his constitutional right to counsel or, alternatively, received ineffective assistance of counsel, and makes other claims of error relating to the imposition of sentence and the abstract of judgment. We agree that defendant was constructively denied his constitutional right to the assistance of counsel at sentencing. We shall vacate the sentence and remand for resentencing. The judgment of conviction is otherwise affirmed.

BACKGROUND FACTS AND PROCEDURE

A.      *Attempted murders of Marcos, Alexis, and Jose*

On the evening of October 8, 2016, Marcos H. (Marcos), attended a concert at a Sacramento area nightclub with a group that included his brothers, Alexis C. (Alexis) and Victor C. (Victor), and friends Jose C. (Jose) and Jesus C. (Jesus).

---

**1**      Undesignated statutory references are to the Penal Code.

2

The concert ended at approximately 1:30 a.m., at which point Marcos's group exited the club to a parking lot full of people. They were unarmed, and most of the members of the group had been drinking heavily and were visibly intoxicated. Security at the event described them as loud, obnoxious, and aggressive, and that they were picking fights and "causing trouble" that night.

In front of the club, members of Marcos's group got into a physical fight with one of the bands that played that night. The fight began in front of the club and moved to the rear before security broke it up. The security team then escorted Marcos's group back to the front of the club, where Victor's wife, Jennifer C. (Jennifer), was waiting to drive them home. On the way, some of those in Marcos's group punched at cars that were driving by and yelled at the occupants of the cars. Security officers specifically recalled a verbal altercation between Marcos's group and the occupants of a black sedan.

Meanwhile, in front of the club, several members of Marcos's group, including Alexis, Jose, and Jesus, decided to get some food from a taco truck parked outside the club. Marcos testified that when they arrived at the truck, Alexis and Jose started "cutting the line," "bumping into people," and Jesus was loudly demanding his tacos. An argument ensued with two men, who appeared to be friends, standing in (or near) the line at the taco truck. After Jesus loudly demanded his tacos, Marcos testified that one of the men turned and said, "Don't scream in my ear." Marcos told the police that the other man, later identified as defendant, was wearing a red soccer jersey, whom Marcos had recalled seeing earlier inside the club. Marcos told the police that defendant said, "You guys really think you can fuck with me like that?" Marcos testified that Alexis then looked at defendant and gestured with his head, as if to say, "What's up?" Marcos testified that defendant then lifted his shirt and drew a black semiautomatic handgun from his waistband. As another man also began lifting his shirt, Jesus fled.

Marcos testified that he instinctively ran toward defendant, who was about 10 feet away, and tried to bear hug him to "keep the gun down." However, after a brief struggle,

3

he was shot once in the right leg and fell to the ground. Alexis testified that when he saw the gun, he also attempted to grab it, but he was shot as well and fell to the ground.

Jose testified that after hearing shots, he tried to tackle the shooter from behind, but fell during the struggle. Jose testified that as he lay on the ground, someone shot him several times in the stomach, neck, and legs.

Security guard Veronica H. (Veronica), who was standing near the taco truck, testified that she saw Marcos's group arguing with two men in the food line. She saw one of those two men pull out a black gun with an extended magazine (an "extra piece [on] the bottom") and point it in the direction of the group. She testified that she saw two shots fired before she hid behind her car. Her description of the shooter was generally consistent with defendant's appearance: Hispanic, around 20 to 25 years old, black hair pulled into a ponytail, neck tattoos, four dots tattooed under his left eye, wearing a red T-shirt, blue jeans, and white shoes. She recognized the shooter as someone who had been in the club earlier that evening in a group with three to five others.

Cesar Aleman-Luna (Aleman-Luna) and Gustavo C. (Gustavo) were working in the taco truck at the time of the shooting. Gustavo testified that he heard an argument outside and then saw a man in a red T-shirt draw a gun from his waistband and point it at another man, dressed in black, who tried to flee. Gustavo did not see the shooter fire the gun, but he heard the gunshots and concluded the fleeing man in black had been shot because the man "jumped to the floor."

Witnesses also described seeing a second shooter. Catherine G. (Catherine), who had attended the concert that night, identified the second shooter as codefendant Garcia. Catherine testified that she saw Garcia standing and pointing a gun at a man on the ground. She heard the man on the ground yelling, "Don't shoot. Don't shoot," as Garcia shouted, "Get up," before seeing Garcia shoot the prone man "[p]robably twice."

4

Consistent with Catherine's account, a security guard testified that he saw a second shooter stand over someone and fire several shots. His description of this shooter was generally consistent with the appearance of Garcia.

B.     *Murder of Aleman-Luna*

Multiple witnesses testified that after the initial round of gunshots, there was a brief pause before shooting resumed. Gustavo testified that during the pause, Aleman-Luna left the truck to shut off the propane tanks. Through the truck's side mirror, Gustavo watched Aleman-Luna bend down at the back of the truck. As Aleman-Luna stood back up, he was shot five times. He died from his wounds. None of the witnesses who testified were able to see who shot Aleman-Luna and there was no evidence as to what type of gun was used to shoot him.

After the shooting, a witness described seeing defendant and two other men flee the scene in a silver Jeep Grand Cherokee registered to codefendant Orlando Vidana (Vidana).

C.     *Ballistics evidence*

Officers recovered 13 bullet casings from the scene: two .40-caliber casings and 11 nine-millimeter casings. A criminalist testified that the two .40-caliber casings were fired from a single .40-caliber firearm and that the nine-millimeter casings also were fired from a single gun.

D.     *Investigation and arrest*

Based on surveillance videos and cell phone records, police detectives determined that defendant, Garcia, Vidana, and two other men (Jason C. and Alejandro J.) arrived at the club together in two cars: Vidana's silver Jeep and a dark sedan. After the concert ended, at approximately 1:30 a.m., defendant's group returned to their cars and the dark sedan followed the Jeep around the parking lot before the Jeep drove away.

At approximately 2:00 a.m., security guards can be seen on video reacting to a disturbance outside the club. At around the same time, a dark sedan can be seen driving

5

through the parking lot of the club. Shortly thereafter, Jason C. called defendant. Vidana's Jeep, which had been traveling away from the club, made a U-turn and headed back to the club. The shooting occurred within minutes after the Jeep returned to the club. Immediately after the shooting, cameras recorded the Jeep fleeing the scene.

Approximately 10 days after the shooting, police found Vidana's Jeep abandoned at an apartment complex in Vallejo. The license plates had been removed. Samples taken from inside the Jeep revealed gunshot residue particles on the driver's seat and the left rear passenger seat. Investigators found a live nine-millimeter ammunition cartridge in the glove box. DNA taken from the interior of the Jeep consistent with Vidana and Garcia was found, but inconclusive as to defendant. DNA taken from the cartridge was consistent with Vidana.

Police subsequently arrested Garcia and Vidana. Inside Garcia's residence, police found clothing that matched what he reportedly had been wearing on the night of the shooting: a pair of black dress pants and a white button-up collared shirt.

Defendant was arrested in December 2016 after a car chase. Alex L. (Alex), who was in the car with defendant during the pursuit, told police that defendant kept yelling, "I'm going away for life." Alex also told police that defendant had been staying with him "on and off." Police searched Alex's residence and found a box of .40-caliber ammunition cartridges in a bedroom. Neither a red shirt nor the firearms used in the shooting were recovered.

Witnesses identified defendant and Garcia as the shooters in photographic lineups and at trial.

E.    *Verdict and sentencing*

The People filed an information charging defendant and codefendants Garcia and Vidana with the following felonies: the murder of Aleman-Luna (§§ 187, subd. (a)—count one); the attempted murder of Alexis (§§ 664, 187, subd. (a)—count two); the attempted murder of Marcos (§§ 664, 187, subd. (a)—count three); and the attempted

6

murder of Jose. (§§ 664, 187, subd. (a)—count four.) The information alleged in counts one through four that defendant and Garcia personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (c) & (d)) as to each of the four victims. It also charged defendant with being a felon in possession of a firearm. (§ 29800, subd. (a)(1)—count six.)[2] The information further alleged that defendant suffered a prior strike conviction for robbery (§ 211) within the meaning of the Three Strikes law. (§§ 667, subds. (b)-(i), 1170.12, subd. (c)(2).)

After trial, the jury found Garcia guilty of the first degree murder of Aleman-Luna (count one), the attempted murders of Alexis (count two) and Jose (count four), and being a felon in possession of a firearm (count five), but not guilty of the attempted murder of Marcos (count three). The jury found codefendant Vidana not guilty of counts one and four, but deadlocked on counts two and three.

The jury found defendant not guilty of the attempted murder of Alexis and Jose (counts two & four), but guilty of the second degree murder of Aleman-Luna (count one), the attempted murder of Marcos (count three), and being a felon in possession of a firearm (count six). The jury also found true the firearm allegations attached to counts one and three. In a bifurcated proceeding, the trial court found true that defendant suffered a prior strike conviction.

The court imposed a total aggregate sentence of 99 years four months to life, consisting of a determinate term of 19 years four months, plus an indeterminate term of 80 years to life. The determinate term was comprised of the upper term of nine years on count three, and a consecutive term of eight months (one-third the middle term) on count six, each doubled under the Three Strikes law. The indeterminate term was composed of 15 years to life on count one, doubled under the Three Strikes law, plus two consecutive

---

[2]    Count five charged the same offense against Garcia.

7

terms of 25 years to life for the firearm enhancements on counts one and three. Defendant filed a timely notice of appeal.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant argues there was insufficient evidence to support his convictions for the murder of Aleman-Luna and the attempted murder of Marcos. We disagree.

A.    *Standard of review*

We review a sufficiency of the evidence challenge under the deferential substantial evidence test. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805.) Under that standard, we review the entire record to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We do not reweigh the evidence or reevaluate the witnesses' credibility. (*Ibid.*) Rather, we view the facts in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. (*Ibid.*) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*Ibid.*)

B.    *Attempted murder*

Defendant contends his conviction for attempted murder (count three) must be reversed because there was insufficient evidence for the jury to find beyond a reasonable doubt that he intended to kill Marcos.

To prove the crime of attempted murder, the prosecution must establish that the defendant had the specific intent to kill the attempted murder victim. (*People v. Sanchez* (2016) 63 Cal.4th 411, 457; CALCRIM No. 600.) Because there rarely is direct evidence

8

of a defendant's mental state, the intent to kill ordinarily may be inferred from the defendant's acts and the underlying circumstances.  (*Sanchez, supra*, at p. 457; *People v. Smith* (2005) 37 Cal.4th 733, 741 (*Smith*).)  "Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact."  (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946 (*Lashley*).)  Our sole function on appeal is to determine if any rational trier of fact could have found the requisite intent to kill beyond a reasonable doubt.  (*Ibid.*; *People v. Johnson* (1980) 26 Cal.3d 557, 576.)  On this record, we conclude the evidence was sufficient to reasonably infer defendant harbored an intent to kill.

The evidence shows that after the concert ended, members of Marcos's group were belligerent, picking fights with other attendees, including people attempting to drive home, and "causing trouble" with security personnel.  Around 2:00 a.m., there was a verbal altercation in the parking lot between Marcos's group and the occupants of a dark sedan.  A short time later, Jason C. called defendant, at which point Vidana's Jeep turned around and returned to the club.  Defendant armed himself with a handgun before returning to the scene.

Shortly after returning to the club, defendant was involved in a verbal altercation with some members of Marcos's group.  Defendant was heard saying, "You guys really think you can fuck with me like that?"  Witnesses then saw defendant pull out a firearm, point it at the unarmed victims, and fire at least two shots in the direction of the victims, striking Marcos once.  Immediately after the shooting, defendant fled the scene.  A few months later, when defendant was fleeing from police, he was heard saying, "I'm going away for life."

Viewing the evidence in the light most favorable to the verdict, as we must, the jury reasonably could have drawn the inference that when defendant shot Marcos, he harbored an intent to kill.  (See *Smith, supra*, 37 Cal.4th at pp. 741-742 [the act of purposefully firing a lethal weapon at another human being at close range, without legal

9

excuse, may support an inference that the shooter acted with an intent to kill]; *People v. Jackson* (1989) 49 Cal.3d 1170, 1201 [act of firing shotgun at close range supported inference of intent to kill]; *People v. Cardenas* (2020) 53 Cal.App.5th 102, 119-120 [pointing a gun in the direction of men and firing multiple shots supported inference of intent to kill]; *Lashley, supra*, 1 Cal.App.4th at p. 945 [same].)

Relying primarily on Marcos's testimony that he was shot during a struggle, defendant argues the evidence does not support a finding that he intended to shoot Marcos, let alone kill him. Defendant emphasizes that there is no evidence he aimed the gun at a vital area of Marcos's body, and no evidence that he took any additional steps to kill Marcos after he was shot and fell to the ground. However, the jury was not required to accept Marcos's version of what happened.

Contrary to defendant's claim that the evidence surrounding the shooting is "essentially undisputed," the jury heard evidence that contradicted Marcos's account.[3] That evidence included the testimony of Gustavo, the taco truck worker, who saw a man in a red shirt draw a gun and point it at a Hispanic man in a black dress shirt who was "one of the guys . . . he was arguing with." His description of the clothing the victim was wearing is consistent with what Marcos was wearing when he was shot: a "black button-up shirt." Gustavo testified that after defendant pointed the gun, there was a slight "pause" before the man in the black shirt "[t]urned and tried to run." Although Gustavo did not see the shooter fire the gun, he heard the gunshots and assumed the fleeing man was shot because the man fell to the ground.

Veronica, one of the security guards, offered a similar account. She testified that she saw a man matching the description of defendant pull out a gun and fire two shots in

---

[3]     We also note that Marcos's account is not necessarily inconsistent with the other witnesses. The jury could have credited his testimony that there was a struggle, while also concluding that defendant pointed the gun at Marcos, before or after that struggle.

10

the direction of the members of Marcos's group who had been arguing with the shooter. She testified that when the shooter pulled out the gun, the members of Marcos's group started to run. Likewise, in her initial statement to the police, Victor's wife Jennifer said that a man dressed in red pulled out a gun and started "shooting at [her] family."

Defendant is adamant that the victim's account must prevail, but a reasonable jury could have credited the testimony of the impartial security guard and taco truck worker over the memories of an admittedly intoxicated victim. On review, we may not substitute our evaluation of a witness's credibility for that of the jury. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

We reject defendant's argument that there was insufficient evidence of intent to kill because the bullet struck Marcos in the leg and defendant did not then shoot him again. As the court recognized in *Lashley, supra*, 1 Cal.App.4th at page 945, "[t]here is nothing inherently illogical or absurd in a finding that a person who unsuccessfully attempted to kill another did so with the intent to kill. The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance. Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind." (Accord, *People v. Cardenas, supra*, 53 Cal.App.5th at p. 120.) Even when an act of shooting is done " 'without advance consideration and only to eliminate a momentary obstacle or annoyance,' the jury could still infer, from the totality of the circumstances, that [the defendant] acted with express malice toward that victim." (*Smith, supra*, 37 Cal.4th at pp. 743-744.)

On this record, we conclude a rational jury could find beyond a reasonable doubt that defendant harbored an intent to kill Marcos.

C.    *Second degree murder*

In supplemental briefing, defendant challenges the sufficiency of the evidence to support his conviction for the murder of Aleman-Luna, either as a direct perpetrator or as

11

an aider and abettor. Defendant argues that because there is no direct evidence as to who shot Aleman-Luna, or the caliber of the weapon used, there is insufficient evidence to prove defendant fired the fatal shot. And because the jury acquitted Garcia of the attempted murders of Jose and Alexis, defendant argues he cannot be held vicariously liable as a direct aider and abettor.

The People respond that there was ample evidence to support a finding that defendant aided and abetted Garcia in the murder of Aleman-Luna. The People argue that because Garcia's intent to kill transferred to Aleman-Luna under the doctrine of transferred intent, defendant likewise became liable for the murder of Aleman-Luna. The People also argue that any inconsistency in the verdicts is irrelevant as a defendant may not challenge the sufficiency of the evidence based on the jury's determination that evidence on another count was insufficient. (*People v. Lewis* (2001) 25 Cal.4th 610, 656 [sufficiency of the evidence review is independent of the jury's determination of evidence on another count]; *People v. Palmer* (2001) 24 Cal.4th 856, 860-861 [inconsistent verdicts are allowed to stand].)

In reply, and despite having addressed aiding and abetting months earlier in his supplemental opening brief, defendant argues that his conviction cannot be affirmed on an aiding and abetting theory because the prosecution did not argue that theory at trial. Defendant is incorrect.

We, of course, cannot affirm a conviction under a theory on which the jury was not instructed at trial. (*People v. Kunkin* (1973) 9 Cal.3d 245, 250-251.) But that is not the situation here. The trial court gave the jury the standard instructions defining aiding and abetting. (CALCRIM Nos. 400 & 401.) Thus, the jury was instructed that a person may be guilty of a crime either as the direct perpetrator or as someone who aided and abetted the direct perpetrator. The jury was instructed that a "person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

12

Nothing in the instructions suggested that the aiding and abetting instructions did not apply to defendant or that defendant could not be found guilty of the charges in count one under an aiding and abetting theory. To the contrary, the jury specifically was instructed that unless otherwise indicated, "all instructions apply to each defendant."

In finding defendant guilty, the jury was not bound by the prosecution's arguments at trial. The "prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126; accord, *People v. Leonard* (2014) 228 Cal.App.4th 465, 487; see also *People v. Barton* (1995) 12 Cal.4th 186, 203 [court's sua sponte duty to instruct on lesser included offenses arises not from the arguments of counsel but from the evidence at trial].) Thus, even if the prosecution advanced only a direct perpetrator theory at trial, based on the evidence presented and the instructions given, the jury nevertheless could have found defendant guilty as an aider and abettor. (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921 (*Alexander*).)[4] Further, provided each juror was convinced beyond a reasonable doubt that defendant was guilty of murder, the jury need not have agreed upon the particular theory of guilt. (*Alexander, supra*, at p. 921; accord, *People v. Majors* (1998) 18 Cal.4th 385, 408.)

Our review of the sufficiency of the evidence also is not limited by the prosecution's theories at trial, but instead by the evidence presented. Where, as here, the jury may have relied on more than one valid theory of guilt, we must review the evidence in the record to determine whether it supported any theory. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 [it must be clear that upon no hypothesis whatever is there sufficient

---

**4** A trial court has a duty to instruct on general principles of law raised by the evidence and necessary for the jury's understanding of the case, even if inconsistent with the parties' theories of the case. (*Alexander, supra*, 49 Cal.4th at p. 920; *People v. Wickersham* (1982) 32 Cal.3d 307, 323, overruled on other grounds by *People v. Barton, supra*, 12 Cal.4th at p. 200.)

evidence to support the verdict]; see also *People v. Kaufman* (2017) 17 Cal.App.5th 370, 381; *People v. Sanchez* (2001) 26 Cal.4th 834, 854 (*Sanchez*).)  We conclude that the evidence in this case was sufficient to find defendant guilty of murder both as an aider and abettor and as a direct perpetrator.

"A person aids and abets the commission of a crime when he [or she] acts with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of encouraging or facilitating the commission of the crime, and his [or her] act or advice in some manner aids, promotes, encourages or instigates the commission of the crime. [Citation.]" (*People v. Johnson* (2019) 32 Cal.App.5th 26, 58.)  Here, the evidence shows that almost immediately after receiving the call from Jason C., defendant and Garcia returned to the club armed with handguns.  A few minutes later, defendant got into an argument with some members of Marcos's group.  Defendant and Garcia then pulled out guns, aimed them at unarmed members of Marcos's group, and fired multiple shots at close range before fleeing the scene together.  Defendant instigated the shooting by drawing his firearm first.

This evidence was sufficient for a jury to find, beyond a reasonable doubt, that defendant knew of Garcia's murderous intent; that defendant intended to commit, encourage, or facilitate Garcia in committing murder; and that defendant did in fact aid or abet Garcia in committing murder.  (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118, 1122; see also *People v. Shabazz* (2006) 38 Cal.4th 55, 62 [discussing doctrine of transferred intent].)  Indeed, in a situation such as this, where two persons commit a crime together, "both may act in part as the actual perpetrator and in part as the aider and abettor of the other . . . ." (*McCoy, supra*, at p. 1120, italics omitted.)  Thus, even if Garcia fired the shots that killed Aleman-Luna, there was sufficient evidence to hold defendant liable for second degree murder under an aiding and abetting theory.

The evidence also was sufficient for the jury to convict defendant under a direct perpetrator theory.  To find defendant guilty as a direct perpetrator, the People were

14

required to prove that defendant, with malice aforethought, committed an act that caused Aleman-Luna's death.  (CALCRIM No. 520; see *People v. Kerley* (2018) 23 Cal.App.5th 513, 532-533.)

"[M]alice, either express or implied, 'does not exist in the perpetrator only in relation to an intended victim.' "  (*People v. Bland* (2002) 28 Cal.4th 313, 323 (*Bland*).) " ' "[M]*ens rea* . . . is an elastic thing of unlimited supply. . . .  It may combine with a single *actus reus* to make a single crime.  It may as readily combine with a hundred *acti rei*, intended and unintended, to make a hundred crimes . . . ." ' "  (*People v. Concha* (2009) 47 Cal.4th 653, 660.)  Thus, a defendant may be liable for two murders if, in the course of killing an intended victim, the defendant or an accomplice also kills a bystander.  (*Ibid*.)  As discussed above, there was substantial evidence to support a finding that defendant had a specific intent to kill.

To satisfy the actus reus element of murder, the defendant (or an accomplice) must have caused the person's death.  (*People v. Concha, supra*, 47 Cal.4th at p. 660.)  An act causes death if the death is a direct, natural, and probable consequence of the act and the death would not have happened without the act.  (CALCRIM No. 520.)  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  (CALCRIM No. 520.)

Proximate cause is clearly established where the defendant's unlawful act is directly connected with the victim's death, with no intervening cause.  (*People v. Cervantes* (2001) 26 Cal.4th 860, 866.)  But a defendant also may be held criminally liable for a result directly caused by his or her act, even though there is another, intervening cause.  (*Id*. at pp. 866-867.)  " ' "If an intervening cause is a normal and reasonably foreseeable result of defendant's original act[,] the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability." ' " (*Id*. at p. 871.)  The consequence need not have been a strong probability; it is enough that the defendant should have foreseen the possibility of some harm of the kind that

15

might result from his act. (*Ibid.*) " '[T]here is no bright line demarcating a legally sufficient proximate cause from one that is too remote.' " (*Ibid.*; accord, *Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 553.)

"[I]t has long been recognized that there may be multiple proximate causes of a homicide, even where there is only one known actual or direct cause of death." (*Sanchez, supra*, 26 Cal.4th at p. 846.) " ' "When the conduct of two or more persons contributes concurrently as the proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result." ' " (*Id.* at p. 847, italics omitted.)

In *Sanchez, supra*, 26 Cal.4th 834, our Supreme Court upheld a murder conviction where two rival gang members engaged in a gun battle that killed an innocent bystander, even though it could not be determined who fired the single fatal bullet. (*Id.* at pp. 838-839.) The court held that because they were jointly engaged in life-threatening deadly acts, inducing each other to act, the unlawful conduct of each was a substantial concurrent, and hence proximate, cause of the victim's death. (*Id.* at pp. 845-849, 851-852; see also *id.* at pp. 854-859 (conc. opns. of Kennard & Werdegar, JJ.).)

Similarly, in *People v. Pock* (1993) 19 Cal.App.4th 1263, cited with approval in *Sanchez, supra*, 26 Cal.4th at page 845, the Court of Appeal upheld a murder conviction when it could not be determined which of several robbers, all of whom shot at the victim, fired the fatal bullet. (*Pock, supra*, at pp. 1267, 1269-1271, 1278.) The court held that even if there was doubt as to whether the defendant was the actual killer, the jury properly was instructed that defendant could be liable for murder if his conduct was a substantial factor in causing the victim's death. (*Id.* at pp. 1275-1276.) The court affirmed the conviction because the evidence showed that even if the defendant did not fire the fatal shot, he "certainly was responsible for instigating the firing of the fatal shot." (*Id.* at p. 1274.)

In *People v. Kemp* (1957) 150 Cal.App.2d 654, also cited with approval in *Sanchez, supra*, 26 Cal.4th at page 846, a defendant and codefendant were jointly convicted of manslaughter after a car occupied by the victim was struck by the codefendant's car during a street race, killing the victim. (*Kemp, supra*, at p. 656.) The appellate court affirmed the defendant's conviction, holding that since the defendant and codefendant were not acting independently, and were inciting and encouraging one another to drive at a fast and reckless rate of speed on a residential street, they both were a proximate cause of the victim's death. (*Id*. at pp. 659-660.)

In *People v. Cornejo* (2016) 3 Cal.App.5th 36, a case addressing instructional error, this court recognized that a defendant can proximately cause a person's death even without proof that the defendant was an actual or direct cause of the victim's death. (*Id*. at pp. 61-62.) The three defendants in *Cornejo* were gang members, two of whom shot multiple times at the victim's car. (*Id*. at pp. 41-42, 44-46.) The victim was killed by a single gunshot wound, but it was unknown who fired the fatal shot. (*Id*. at p. 61.) Nevertheless, we held that the jury properly concluded that both shooters proximately caused the victim's death, regardless of whose bullet caused the fatal wound. (*Id*. at pp. 61-62; accord, *Bland, supra*, 28 Cal.4th at pp. 318, 337-338.)

Similarly, here, even if it could not be determined who fired the shots that killed Aleman-Luna, the evidence was sufficient for the jury reasonably to infer that defendant was a proximate cause of the victim's death by drawing his weapon first and setting in motion a chain of events that led to the victim's death.[5]

---

[5] Because we find the evidence sufficient to convict defendant as a direct perpetrator even if Garcia fired the fatal shots, it is unnecessary for us to decide whether the evidence also was sufficient for the jury to find that defendant directly contributed to the death by shooting Aleman-Luna.

17

## II

### *Motion for Mistrial*

In supplemental briefing, defendant contends that the trial court erred in denying his motion for a mistrial after a prosecution witness ran afoul of a pretrial ruling by describing defendant's tattoo as "gang-related." We find no error.

A.    *Additional background*

Before trial, the prosecution filed a motion in limine to prevent the defense from referencing the victims' gang membership, affiliation, or activities. After discussion, the court prohibited either side from introducing any "gang information" during the People's case-in-chief. The court confirmed that if defense counsel sought to introduce gang evidence to support a theory of self-defense, the admissibility of that evidence would be litigated after the People's case-in-chief.

During the prosecution's case-in-chief, the prosecutor asked the security guard, Veronica, about defendant's tattoo. The following colloquy transpired:

"[People:] You said you remember a tattoo. [¶] What do you remember about a tattoo or tattoos?

"[Veronica:] In his left side under his eye.

"[People:] What do you remember about a tattoo under his left eye?

"[Veronica:] I just noticed a tattoo.

"[People:] Do you know what kind of tattoo, or what it was of?

"[Veronica:] A gang-related."

At that point, counsel for defendant interjected, "Your Honor, may I be heard for a second?" The court said, "No." The prosecution then continued questioning Veronica, who described the tattoo as "four dots."

During the next break, defendant's counsel moved for a mistrial based on the witness's reference to a "gang-related" tattoo. Defense counsel conceded that the

18

prosecutor had not intentionally sought to elicit the testimony, but argued that it did not matter because the evidence was prejudicial and there was no way to "unring that bell."

The court denied the motion. Although the court acknowledged that gang evidence can be prejudicial, it concluded that the potential prejudice in this case was "relatively minimal" and could be cured by striking the witness's statement and admonishing the jury. In the end, defense counsel refused the offer for a curative instruction because he did not believe it was possible to sanitize the gang reference and did not want to highlight the testimony.

B. *Analysis*

A motion for mistrial should be granted " 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]. 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Avila* (2006) 38 Cal.4th 491, 573.) Accordingly, we review a trial court's ruling on a motion for mistrial under the deferential abuse of discretion standard. (*People v. Bolden* (2002) 29 Cal.4th 515, 555.)

Applying that standard, we find no abuse of discretion. Although we acknowledge the potentially inflammatory nature of gang evidence, defendant overstates the significance of the testimony at issue in this case. Unlike the cases cited by defendant that involved extensive evidence of gang membership or gang affiliations,[6] the evidence

---

[6] See *People v. Albarran* (2007) 149 Cal.App.4th 214, 227 ["panoply of incriminating gang evidence"]; *People v. Cardenas* (1982) 31 Cal.3d 897, 905-906 [cumulative evidence that went far beyond mere gang membership]; see also *People v. Williams* (1997) 16 Cal.4th 153, 193 [court did not err in denying motion to exclude gang evidence]; *People v. Cox* (1991) 53 Cal.3d 618, 660, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [not ineffective assistance of counsel to inquire into defendant's involvement in gang activity].

here consisted of a single, fleeting reference to a possible "gang-related" tattoo. The witness's testimony was brief, easy to miss, and insignificant in the context of a 12-day trial involving 25 separate witnesses. Further, because the witness was not an expert on gangs or a member of law enforcement, her unsubstantiated opinion about defendant's tattoo did not automatically mean that defendant was in a gang or that the shooting was gang related.

The court subsequently struck the brief reference to a "gang-related" tattoo from the record in case the jury requested a readback. During deliberations, the jury requested a readback of the security guard's testimony and the jury was instructed to accept the readback as accurate. We presume the jury understood and followed the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) There was no evidence of bad faith.

On this record, we conclude the witness's brief and spontaneous reference to a "gang-related" tattoo was not incurably prejudicial. (*People v. Avila, supra*, 38 Cal.4th at pp. 572-574 [brief reference to defendant having been in prison did not deny fair trial]; *People v. Bolden, supra*, 29 Cal.4th at pp. 554-555 [fleeting reference to parole office did not deny fair trial]; see also *People v. Mendoza* (2000) 24 Cal.4th 130, 162-163, superseded by statute on other grounds as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 62-63 & fn. 8 [fleeting references to gang evidence did not deny due process].) The court was well within its discretion in denying the mistrial motion.

III

*Causation Instruction*

In a second supplemental brief, defendant contends the trial court erred and violated due process by failing to sua sponte instruct the jury on the definition of causation as part of its murder instructions. We conclude that any error was harmless and did not deny defendant due process.

20

A.      *Additional background*

Defendant was charged in count one with the murder of Aleman-Luna, with an enhancement for personally and intentionally discharging a firearm causing great bodily injury or death.  After the People rested, the trial court and the parties conferred off the record regarding jury instructions.  After going back on the record, the trial court summarized the instructions that would be given to the jury, and the parties indicated they were "satisfied" with the proposed instructions.  Defense counsel raised no objections.

After closing arguments, the trial court instructed the jury on the elements of murder using CALCRIM No. 520, the pattern instruction.  As relevant here, the court instructed the jury that "[t]o prove that a defendant is guilty of this crime the People must prove that:  [¶]  1.  The defendant committed an act that caused the death of another person; [¶] AND [¶] 2.  When the defendant acted, he had a state of mind called 'malice aforethought'; [¶] AND [¶] 3.  He killed without lawful excuse or justification."

In providing these instructions, the trial court did not include the following bracketed portions of the instruction defining causation:  "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  [¶]  There may be more than one cause of death.  An act causes death only if it is a substantial factor in causing the death.  A substantial factor is more than a trivial or remote factor.  However, it does not need to be the only factor that causes the death."  (CALCRIM No. 520.)  The court also did not give the jury a more

21

general causation instruction under CALCRIM No. 240 or CALCRIM No. 620, nor were they requested.

B.     *Analysis*

Defendant contends the trial court committed reversible error by omitting the bracketed paragraphs on causation from the CALCRIM No. 520 pattern instruction on murder.  The short answer to this contention is that, even if we assume the court erred by failing to give such instructions, and that the claim was not forfeited, the error was harmless under both the state and federal standards of prejudice.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711]; *People v. Watson* (1956) 46 Cal.2d 818, 837.)

Under the instructions given, the jury properly concluded that defendant "caused" the death of Aleman-Luna.  While the court's instructions on murder did not include a legal definition of causation, any error had no effect on the jury's verdict.  Indeed, the omitted definition of causation was likely broader, not narrower, than jurors otherwise might assume where, as here, the issue was whether defendant's conduct was a substantial factor in bringing about the victim's death.  (See *Bland, supra*, 28 Cal.4th at p. 338.)  Further, the possibility of jury confusion was diminished by the prosecutor's closing arguments, which emphasized that the People did not have to prove defendant's bullet hit Aleman-Luna, only that defendant "did an act that naturally and probably" led to Aleman-Luna's death.  (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, overruled in part on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

In any event, the record reflects the jury necessarily determined the causation question adversely to defendant in the context of another, properly given instruction.  For the firearm enhancement, the trial court instructed the jury under CALCRIM No. 3149.  In relevant part, the jury was instructed:  "If you find the defendant guilty of the crimes charged in Counts 1, 2, 3, or 4, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally and intentionally

22

discharged a firearm during that crime causing great bodily injury or death. [¶] You must decide whether the People have proved this allegation for each crime, and return a separate finding for each crime. [¶] To prove this allegation the People must prove that: [¶] 1. The defendant personally discharged a firearm during the commission of that crime; [¶] 2. The defendant intended to discharge the firearm; [¶] AND [¶] 3. The defendant's act caused great bodily injury to, or the death of, a person."

Unlike the instructions on murder, the instructions on the firearm enhancement included the bracketed language relating to causation. (CALCRIM No. 3149.) That language is virtually identical to the bracketed portions of the instruction omitted from CALCRIM No. 520, except that it applies to "great bodily injury or death" instead of just "death." (Cf. CALCRIM Nos. 520 & 3149.) When the jury found true the allegation that defendant "intentionally and personally discharged a firearm . . . and thereby caused the death of [Aleman-Luna] within the meaning of []section 12022.53(d)" the jury necessarily found that defendant's conduct was both a cause-in-fact and proximate cause of Aleman-Luna's death. Thus, any alleged instructional error with respect to the murder charge was harmless beyond a reasonable doubt and did not deny defendant due process. (*People v. Carrillo* (2008) 163 Cal.App.4th 1028, 1037-1038.)

IV

*Sentencing Issues*

A.    *Assistance of counsel*

Defendant argues that his sentence must be vacated and this matter remanded for a new sentencing hearing because his counsel's performance at the October 2019 sentencing hearing was so inadequate that he was constructively deprived of his constitutional right to counsel. Alternatively, defendant argues that he received ineffective assistance of counsel. We agree.

Under the Sixth Amendment, a criminal defendant has the right to the assistance of counsel. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215; *In re Perez* (1966) 65 Cal.2d

23

224, 229.)  The right to counsel is the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 692].)  This right applies at all " 'critical stages' " of a criminal proceeding in which the substantial rights of a defendant are at stake, including sentencing.  (*People v. Bauer* (2012) 212 Cal.App.4th 150, 155.)

A defendant has the burden of proving a claim of ineffective assistance of counsel. (*People v. Bell* (2020) 48 Cal.App.5th 1, 22.)  Ordinarily, to establish such a claim, a defendant must show both that (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice.  (*Strickland v. Washington, supra*, 466 U.S. at pp. 687-688, 693-694; *People v. Ledesma, supra*, 43 Cal.3d at pp. 216-218.)

Relying on *United States v. Cronic* (1984) 466 U.S. 648 [80 L.Ed.2d 657] (*Cronic*), defendant argues that his case falls into a small subset of cases in which prejudice must be presumed because counsel's conduct was so egregious as to constitute a complete abandonment of the client.  (*United States v. Olano* (9th Cir. 1995) 62 F.3d 1180, 1193; *Florida v. Nixon* (2004) 543 U.S. 175, 190 [160 L.Ed.2d 565, 580].)  In *Cronic*, the United States Supreme Court identified three such scenarios where prejudice may be presumed:  (1) when the accused is denied the presence of counsel at a critical stage of the proceeding; (2) when counsel fails to subject the prosecution's case to "meaningful adversarial testing"; and (3) when counsel must render assistance under circumstances where the likelihood that any lawyer could provide effective assistance is so small that a presumption of prejudice is appropriate.  (*Cronic, supra*, at pp. 659-660; *Bell v. Cone* (2002) 535 U.S. 685, 695-696 [152 L.Ed.2d 914, 927-928]; accord, *In re Avena* (1996) 12 Cal.4th 694, 727.)

24

Here, defendant argues that counsel's performance at the sentencing hearing was so inadequate that it should be deemed a constructive denial of his right to assistance of counsel.[7] We agree.

At sentencing, counsel for defendant essentially conceded that he was unprepared to meaningfully represent defendant, informing the court that "sentencing came up very, very quickly," and that because he had been in trial since the jury verdict, he had not had "much time to talk to [his] client about it." When the judge asked whether counsel had received a copy of the probation report and had an opportunity to review it with defendant, counsel hedged, "I've received it. He has read it. He will have a copy of it. [¶] Again, I didn't get it until just a couple days ago, and I've been quite engaged since then, but he has no questions on it." Defense counsel also put on the record that during trial he had discussed with defendant the idea of filing a motion for a new trial if there was a conviction, but that defendant subsequently asked him "not to make the motion to ask for the continuance based on that."

Aside from these brief comments, defense counsel did nothing to represent defendant at the sentencing hearing. Counsel did not file a sentencing memorandum, did not raise any arguments during the trial on defendant's prior conviction, did not ask the court to dismiss defendant's prior strike conviction or the firearm enhancements, did not present any mitigating evidence or oppose the prosecution's aggravation argument, or make even a single comment regarding the court's sentencing choices.[8]

---

**7** Defendant also argues in passing that his counsel's performance constructively deprived him of the assistance of counsel at the court trial of the prior strike conviction. We may disregard this argument as it was not properly presented under a discrete heading with appropriate analysis. (*People v. Carroll* (2014) 222 Cal.App.4th 1406, 1412, fn. 5.)

**8** Defendant also complains that his counsel failed to argue that the prior strike conviction was invalid because of a jurisdictional defect in the complaint and/or because of the passage of Proposition 57 (approved Nov. 2016) or Senate Bill No. 1391 (2017-

25

We are persuaded that this is the rare case in which defense counsel's performance was so inadequate that it amounted to a constructive denial of the assistance of counsel at sentencing. (*Miller v. Martin* (7th Cir. 2007) 481 F.3d 468, 473 (*per curiam*) [applying exception where counsel essentially said nothing throughout sentencing hearing]; *Patrasso v. Nelson* (7th Cir. 1997) 121 F.3d 297, 303-305 [constructive denial where counsel performed no investigation before sentencing and made no effort to contradict the prosecution's case or obtain mitigated punishment]; *Tucker v. Day* (5th Cir. 1992) 969 F.2d 155, 159 [constructive denial where counsel remained silent throughout resentencing hearing]; *Harding v. Davis* (11th Cir. 1989) 878 F.2d 1341, 1345 [prejudice presumed where defense counsel was silent throughout trial].) Accordingly, the circumstances justify a presumption of prejudice.

The People argue that even if defense counsel was not prepared for the hearing, there was no constructive denial of defendant's assistance of counsel because it was defendant who made the decision to proceed with sentencing. We find two problems with this argument. First, the record shows that defendant merely asked counsel not to request a continuance for purposes of preparing a new trial motion. This is hardly proof that defendant wanted counsel to proceed with sentencing despite knowing that counsel was unprepared to do so.

Second, even if it was defendant's wish to proceed to sentencing without delay, this would not excuse counsel's failure to request a continuance if it were necessary for counsel to adequately prepare for the hearing. Except when certain fundamental rights are implicated, it is the attorney who controls the conduct of the case and has the

2018 Reg. Sess.). These arguments lack merit. As the People note, the jurisdictional defect in the complaint was cured by amendment. And defendant was not entitled to any ameliorative benefit under Proposition 57 or Senate Bill No. 1391 because, as he concedes, his judgment became final before the effective date of the changes in the law. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303-304; see also *People v. Esquivel* (2021) 11 Cal.5th 671, 680.)

authority and duty to determine questions of strategy and trial tactics. (*People v. Frierson* (1985) 39 Cal.3d 803, 812-814; *Townsend v. Superior Court* (1975) 15 Cal.3d 774, 781.) The statutory right to be sentenced within 20 judicial days after the verdict (§ 1191) is not one of those fundamental rights within a defendant's ultimate control. (See *Townsend, supra*, at p. 781 [constitutional right to speedy trial is fundamental right, but statutory right to be tried within 60 days is not].) Thus, if a continuance was necessary, it was incumbent on counsel to request one, even if the request would have been contrary to defendant's wishes.

The failure of defense counsel to represent his client's interests or provide any meaningful assistance at the sentencing hearing was a constructive denial of defendant's right to counsel at a critical stage of the proceeding. Accordingly, under *Cronic, supra*, 466 U.S. 648, we shall vacate defendant's sentence and remand for a new sentencing hearing.

At resentencing, defendant will be entitled to the benefit of Senate Bill No. 81 (2021-2022 Reg. Sess.), which amended section 1385 to specify factors that the court must consider when deciding whether to strike enhancements from a sentence in the interest of justice. (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)

B. *Designation of concurrent/consecutive sentence under section 669*

Defendant next contends that the trial court failed to determine whether his determinate sentence in the current case should run consecutively or concurrently to a determinate term imposed in a prior case. Defendant contends that because the trial court failed to make this determination, under section 669, subdivision (b), the determinate sentence in this case must run concurrently to the determinate sentence in the other case. The People agree, as do we.

Section 669, subdivision (a) provides that when a person is convicted of two or more crimes, in the same proceeding or court or in different proceedings or courts, the court, at the time of pronouncing the subsequent judgment, shall determine whether the

27

terms shall run concurrently or consecutively.  (§ 669, subd. (a).)  Subdivision (b) provides that if the court fails to make that determination within 60 days after imprisonment upon the subsequent judgment, then "the term of imprisonment on the second or subsequent judgment shall run concurrently."  (§ 669, subd. (b).)

Here, the probation report shows that in 2017 in Solano County, defendant was convicted of other felonies and sentenced to 16 years in prison (Solano County case No. VCR228205).  There was no mention of this prior judgment and sentence during the pronouncement of judgment in this case or within 60 days after the commencement of his imprisonment upon the judgment.  Accordingly, under section 669, subdivision (b), the term of imprisonment imposed in this case must run concurrently to the term of imprisonment imposed in the Solano County case.

C.      *Error in abstract of judgment*

Defendant also contends that the abstract of judgment mistakenly shows a firearm enhancement attached to count two instead of count three.  He is correct.  Defendant was convicted in counts one, three, and six, and the jury found the firearm allegations true as to counts one and three.  The abstract of judgment contains a mistake and should be corrected.  (*People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 858.)

## DISPOSITION

Defendant's sentence is vacated and the matter remanded for resentencing in a manner consistent with this opinion.  Following resentencing, the trial court shall prepare an amended and corrected abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.  The judgment of conviction is otherwise affirmed.

The clerk of this court shall forward a copy of this opinion to the State Bar of California and notify defense counsel in the trial court proceedings, as required by statute.  (See Bus. & Prof. Code, § 6086.7, subds. (a)(2) & (b).)


      KRAUSE      , J.


We concur:


      HULL      , Acting P. J.


      MAURO      , J.